### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| 1 GLOBAL CAPITAL LLC, *et al.*,[1] | Case No. 18-19121-RBR |
| Debtors. | (Jointly Administered) |

### DEBTORS' MOTION FOR AUTHORITY TO SELL CUSTOMER LIST
### OTHER THAN IN THE ORDINARY COURSE OF BUSINESS
### FREE AND CLEAR OF CLAIMS AND INTERESTS

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")

move for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed**

**Order**"), authorizing a sale (the "**Sale**") of the Customer List (as defined below) other than in the

ordinary course of business free and clear of claims and interests as more fully set forth herein.  In

support of this motion (the "**Motion**" or "**Customer List Sale Motion**"), the Debtors state:

### I.
### Concise Statement of Sale Required by Local Rule 6004-1(B)[2]

| Material Term | Summary[3] |
|---|---|
| **Parties**<br><br>*Local Rule 6004-1(B)(1)* | <u>Seller</u>:  Debtor 1 Global Capital LLC<br><br><u>Buyer</u>:  Advance Service Group LLC d/b/a In Advance Capital, as Stalking Horse Bidder |

---

[1]   The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number, if applicable, are:  1 Global Capital LLC, 1250 E. Hallandale Beach Blvd., Suite 409, Hallandale Beach, FL 33009 (9517); and 1 West Capital LLC, 1250 E. Hallandale Beach Blvd., Suite 409, Hallandale Beach, FL 33009 (1711).

[2]   Capitalized terms used but not defined in this Concise Statement have the meaning ascribed to them in the Customer List Sale Motion below.

[3]   To the extent of any inconsistency between this Summary and the Customer List Sale Motion or the Stalking Horse APA, the terms and conditions of the Customer List Sale Motion or Stalking Horse APA, as the case may be, are controlling.

| Material Term | Summary[3] |
|---|---|
| **Insider of Debtor**<br><br>*Local Rule 6004-1(B)(1)* | None |
| **Assets**<br><br>*Local Rule 6004-1(B)(2)* | The Customer List.  Stalking Horse APA § 1.1 |
| **Deposit**<br><br>*Local Rule 6004-1(B)(2)* | $25,000 earnest money deposit.  Stalking Horse APA § 3.1 |
| **Purchase Price**<br><br>*Local Rule 6004-1(B)(2)* | Commission Fees based on the performance of the Customer List, in an amount not less than a $105,000 Advance Payment.  Stalking Horse APA §§ 3.2 & 3.3. |
| **Assumed Obligations of the Debtors**<br><br>*Local Rule 6004-1(B)(2)* | None; the Sale of the Customer List is free and clear of all claims and interests |
| **Representations and Warranties of Debtors**<br><br>*Local Rule 6004-1(B)(2)* | Representations and warranties customary to an asset sale pursuant to Section 363 of the Bankruptcy Code, including a disclaimer that the Customer List is "as is" "with all faults".  Stalking Horse APA § 4 |
| **Closing Conditions and Closing Date**<br><br>*Local Rule 6004-1(B)(2)* | • Closing conditions customary to an asset sale pursuant to Section 363 of the Bankruptcy Code.  Stalking Horse APA §§ 8 & 9<br>• Closing is sought as soon as reasonably possible, but no later than March 1, 2019.  Stalking Horse APA §§ 10.6(ii) & (vii) |

| Material Term | Summary[3] |
|---|---|
| **Sale subject to higher and better offer**<br><br>*Local Rule 6004-1(B)(3)* | The Sale of the Customer List is subject to higher and better offers as more fully set forth in the Motion.  Stalking Horse APA § 6.1(a) |
| **Auction Terms**<br><br>*Local Rule 6004-1(B)(3)* | • Deadline for submitting Qualified Bids is **January 7, 2019, at 3 p.m. ET**<br>• Auction Date is **January 8, 2019, at 10 a.m.**<br>• Minimum initial overbid is $25,000<br>• Minimum bid increments to be determined by the Debtors at the Auction |
| **Competing bid requirements**<br><br>*Local Rule 6004-1(B)(4)* | A competing bid must be a Qualified Bid as more fully set forth in paragraph 16(b) below, including submission of a Proposed APA redlined to the Stalking Horse APA and a $25,000 earnest money deposit.  Stalking Horse APA § 6.1(a) |
| **Purchaser Protections**<br><br>*Local Rule 6004-1(B)(5)* | The Stalking Horse APA provides for a Break-Up Fee and Expense Reimbursement in an amount of $15,000.  Stalking Horse APA § 6.1(a) |
| **Personally identifiable information**<br><br>*Local Rule 6004-1(B)(6)* | None; the information contained in the Customer List was provided for purposes of obtaining a merchant cash advance for business purposes, not for personal, family, or household purposes |
| **Known Lien Holders in the Assets**<br><br>*Local Rule 6004-1(B)(7)* | None |

| Material Term | Summary[3] |
|---|---|
| **Sale Hearing Date**<br><br>***Local Rule 6004-1(B)(8)*** | **January 9, 2019, at 1:30 p.m.**, at the United States Courthouse. 299 E. Broward Blvd., Courtroom 308, Fort Lauderdale, FL 33301, subject to re-notice or continuance as the Court may find necessary or appropriate |

## II.
## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order or judgment in this matter consistent with the Article III of the United States Constitution.

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and other predicates for the relief sought herein are §§ 105(a), 363(b), 363(f) and 363(m) of the Bankruptcy Code (the "**Bankruptcy Code**"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "**Local Rules**").

4.      No previous motion for the relief sought herein has been made to this Court.

## III.
## Status of the Case

5.      On July 27, 2018 (the "**Petition Date**"), the Debtors commenced the above-captioned cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida.

6.      The Debtors continue to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On September 7, 2018, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the official committee of unsecured creditors (the "**Committee**") [ECF No. 138].

8.      No request has been made for the appointment of a trustee or examiner pursuant to section 1104 of the Bankruptcy Code.

9.      A detailed factual background of the Debtors' business and operations, as well as the events precipitating the commencement of these Chapter 11 Cases, is set forth in the Debtors' Chapter 11 Case Management Summary (the "**Case Management Summary**") [ECF No. 8].

## IV.
## Background

A.      The Customer List

10.      Before the Petition Date, a principal component of the Debtors' business operations involved the sourcing and funding of merchant cash advances ("**MCAs**") typically in an amount of up to $500,000 with small businesses operating in multiple states (the "**Merchants**").   Each Merchant provided the Debtors with information for the purposes of applying for and obtaining an MCA for use in the Merchant's business.   The Debtors compiled and maintained (i) a list of Merchants who applied for and were funded MCAs and the data collected in connection with the applications for and performance of these funded MCAs and (ii) a list of Merchants who applied for but did not obtain funding of MCAs and the data collected in connection with the applications for these non-funded MCAs (collectively, the "**Customer List**").

B.      The Sale Process and Stalking Horse APA

11.      After the Petition Date, the Debtors, in their business judgment, decided to cease sourcing and funding new MCAs.  Having ceased sourcing and funding new MCAs, the Customer List is no longer useful in the Debtors' remaining principal business operation of maintaining and collecting its existing MCA portfolio.  The Customer List nonetheless remains a valuable asset of the Debtors' estates in at least two respects.  First, third-party merchant-cash-advance businesses may be willing to purchase the Customer List to use in their sourcing and funding new third-party

MCAs.  Second, placing the Customer List in the hands of such a purchaser would advance the Debtors' efforts to operate and collect on their existing MCA portfolio insofar as existing Merchants of the Debtors paid off their MCAs with the Debtors as part of sourcing and funding new MCAs from the third-party purchaser of the Customer List.

12.     Accordingly, the Debtors, in consultation with the Committee, commenced a process to sell the Customer List.  Beginning on or about October 23, 2018, the Debtors commenced the marketing process.  The Debtors, through the efforts of their restructuring advisors and the Committee's financial advisors, identified and contacted approximately forty-one (41) potentially interested parties that they believed might be interested in acquiring the Customer List. Of the potentially interested parties contacted, ten (10) executed non-disclosure agreements and were granted access to a data room and began accessing the data room between October 24, 2018 through November 5, 2018.  The data room contains redacted due diligence and other materials concerning the Customer List including data related to all of the Debtors' funded MCAs, summaries of monthly cash receipts, and applications for non-funded MCAs.  Subsequently, the Debtors, through their restructuring advisors and with the assistance of the Committee's financial advisors, engaged in discussions with four interested parties.  As a result of these discussions, the Debtors received non-binding written proposals from all four interested parties.  The Debtors then evaluated the four proposals and determined, in their business judgment, to negotiate with two of the interested parties concerning the terms and conditions of a stalking horse asset purchase agreement.

13.     After negotiating at arm's length and in good faith with the two potential stalking horse bidders and after consultation with the Committee, the Debtors determined in their business judgment that the offer made by Advance Service Group LLC d/b/a In Advance Capital ("**In**

Advance") was the highest and best.[4]  Accordingly, the Debtors and In Advance, as the stalking

horse bidder (the "**Stalking Horse Bidder**"), entered into that certain Asset Sale and Purchase

Agreement, dated as of December 11, 2018 (the "**Stalking Horse APA**"), for the sale of the

Customer List pursuant to section 363 of the Bankruptcy Code, subject to higher and better bids.[5]

A copy of the Stalking Horse APA is attached as **Exhibit B** hereto.

14.    The Stalking Horse APA provides for payment of an earnest money deposit in the

amount of $25,000 (which has been remitted to the Debtors as of the date hereof), and, as more

fully set forth therein, a purchase price comprised of an advanced payment in total amount of

$105,000 to be credited against commission fees based on the performance of the Customer List

(collectively, the "**Purchase Price**").  In the event that the Debtors close a sale of the Customer

List to a purchaser other than the Stalking Horse Bidder, the Stalking Horse APA provides for a

break-up fee and expense reimbursement in the amount of $15,000 (the "**Break-Up Fee and**

**Expense Reimbursement**").

C.    Timeline for Bidding, Auction and Sale Hearing

15.    Now that the Debtors have obtained the Stalking Horse APA they desire to proceed

quickly to an Auction (as defined below) to stimulate further competitive bidding among the

interested purchasers and any other party interested in submitting a bid in accordance with the

Bidding Procedures (as defined below).  The Debtors, in consultation with the Committee, have

determined in their business judgment not to seek an order approving the Bidding Procedures in

advance of the Auction.  Potentially interested bidders may perceive that the value of the Customer

---

[4]    As a matter of disclosure, the Debtors note that In Advance's counsel in this matter was a member of the Debtors'
in-house counsel until September 2017.

[5]    For avoidance of doubt, the terms "Customer List" as used in this Customer List Sale Motion and "Purchased
Assets" as used in the Stalking Horse APA are intended to be and are coextensive.

List decreases over time as Merchants may seek alternative sources to meet their cash needs. The Debtors and Committee therefore believe proceeding directly and expeditiously to a sale hearing sustains competitive interest in the Customer List, maximizing its value and concomitantly reducing administrative expenses that would be incurred by the estates in connection with a separate bidding procedures hearing. Accordingly, the marketing and sale of the Customer List will proceed in accordance with the following timeline:

| Event or Deadline | Date and Time |
|---|---|
| Bid Deadline | **January 7, 2019 at 3 p.m. ET**<br>(1 day before auction date) |
| Deadline for Written Objections to Sale | **January 7, 2019 at 4:30 p.m. ET**<br>(2nd business day before sale hearing date pursuant to Local Rule 5005-1(F)(1)) |
| Selection of Qualified Bidders | **January 7, 2019 at 5 p.m. ET**<br>(1 day before auction date) |
| Auction (if two or more Qualified Bids are received) | **January 8, 2019 at 10 a.m. ET**<br>(1 day before January 9th sale hearing date) |
| Sale Hearing (subject to re-notice or continuance as the Court may find necessary or appropriate) | **January 9, 2019, at 1:30 p.m.**, at the United States Courthouse. 299 E. Broward Blvd., Courtroom 308, Fort Lauderdale, FL  33301 |

D.    Bidding and Auction Procedures

16.    To ensure that the highest and best offer is obtained for the Customer List, the Debtors intend to continue marketing the opportunity to purchase the Customer List in accordance with the following procedures for soliciting and submission of bids after the filing of this Motion (the "**Bidding Procedures**") and, if provided by the Bidding Procedures, conducting a public auction (the "**Auction**"):

a.    Promptly after the filing of this Motion, the Debtors will commence soliciting higher and better bids for the Customer List from other parties ("**Interested Bidders**") who will seek to be pre-qualified by Debtors and,

if pre-qualified by Debtors, will be qualified to bid at the Auction ("**Qualified Bidders**").  As an initial step, any Interested Bidder who seeks to conduct diligence on and obtain access to material information relating to the Customer List will be required to execute a confidentiality agreement prepared by the Debtors.

b.  In order for a party to be a Qualified Bidder, on or before **January 7, 2019, at 3 p.m. ET** (the "**Bid Deadline**"), an Interested Bidder must comply with the following requirements (collectively, a "**Qualified Bid**"):

  (1)  Deliver to the Debtors and Debtors' counsel (i) a clean and duly executed and binding asset purchase agreement (a "**Proposed APA**") that contains substantially similar provisions to the Stalking Horse APA, (ii) a marked Proposed APA reflecting any variations from the Stalking Horse APA, (iii) adequate information regarding the Interested Bidder's financial capability to close the Sale, with a Purchase Price of at least the same value as provided for in the Stalking Horse APA, plus minimum initial overbid in the amount of $25,000, and (iv) a deposit of at least $25,000;

  (2)  Disclose in writing any connections or agreements with the Debtors, any other potential, prospective bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Debtors; and

  (3)  Confirm in writing (i) that it agrees (x) to accept and abide by the terms, conditions and procedures set forth in this Motion, (y) not to request or seek any break-up fee or expense reimbursement, and (z) if deemed a Qualified Bidder, to be bound to the Proposed APA until the earlier of two (2) business days after the closing of the Sale to another party and thirty (30) days after the date of the Auction (the "**Back-Up Bid Expiration Date**"), and (ii) that the Proposed APA is not conditioned on obtaining financing, corporate governance or other approvals, or the outcome of completion of diligence; *provided* that

  (4)  Notwithstanding the forgoing, the Stalking Horse Bidder is a Qualified Bidder, and the Stalking Horse APA is deemed a Qualified Bid.

c.  The Debtors will consult with the Committee concerning any bids submitted by Interested Parties, and the Debtors will determine, in their sole discretion, whether Interested Parties and their submissions constitute Qualified Bidders and Qualified Bids, respectively, no later than **January 7, 2019 at 5 p.m. ET**.

d.  The Debtors may abridge, enlarge or modify the forgoing Bid Procedures.

9

17.    In the event that the Debtors determine they have timely received more than one Qualified Bid, the Debtors shall conduct the Auction with respect to the Customer List.  The Auction will take place on **January 8, 2019, 10 a.m. ET**, in the offices of the Debtors' counsel in Miami, Florida or at such other place, date and time as may be designated in writing by the Debtors and served on the Qualified Bidders via electronic mail.  The Auction shall be governed by the following procedures:

a.    Only the Qualified Bidders shall be entitled to make any subsequent bids at the Auction.

b.    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

c.    Each Qualified Bidder shall appear in person at the Auction, or through a duly authorized representative.

d.    The bidding at the Auction shall be transcribed by a court reporter;

e.    Bidding shall commence at the amount of the highest and best Qualified Bid submitted before the Auction to be determined by the Debtors at the Auction.

f.    Qualified Bidders may then submit successive bids excess of the minimum bid increment to be determined by the Debtors at the Auction.

g.    The Auction shall continue until there is only one offer that the Debtors determine, subject to Court approval, is the highest and best Qualified Bid submitted at the Auction (the "**Prevailing Bid**" and the entity submitting such Prevailing Bid, the "**Prevailing Bidder**"), and is the next highest and best Qualified Bid submitted at the Auction (the "**Back-Up Bid**" and the entity submitting such Back-Up Bid, the "**Back-Up Bidder**").  In making these determinations, the Debtors shall consider, without limitation, the value of the consideration, the net benefit to the Debtor's estate, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, and the number, type and nature of any changes to the Proposed APA requested by each Qualified Bidder.

h.    The Prevailing Bidder shall deliver an executed final asset purchase agreement evidencing and containing the terms and conditions upon which the Prevailing Bid was made (the "**Prevailing APA**").  The Back-Up Bid shall remain open and binding until the Backup Bid Expiration Date.

i. Absent irregularities in the conduct of the Auction, or material and justifiable confusion during the Auction, the Debtors will not seek approval of bids made after the close of the Auction.

j. The Debtors may abridge, enlarge or modify the forgoing procedures for the Auction.

18. In the event that the Debtors determine they have not timely received more than one Qualified Bid, then the Debtors shall not hold the Auction and shall seek approval at the sale hearing of the Sale to the Stalking Horse Bidder (as the case may be, the Stalking Horse Bidder or the Prevailing Bidder, the "**Successful Bidder**") pursuant to the Stalking Horse APA (as the case may be, the Stalking Horse APA or the Prevailing APA, the "**Successful APA**").

E. <u>Form and Manner of Notice</u>

19. Contemporaneously with the filing of this Motion, the Debtors have sought to limit the notice required by Bankruptcy Rule 2002(a)(2) to the Master Service List maintained pursuant to Local Rule 2002-1(H) (collectively, the "**Master Service List**") and to shorten notice as may be necessary to accommodate the sale hearing date. Consistent with that request the Debtors will cause the Motion and notice of hearing to be served on the Master Service List and any entity who has previously furnished the Debtors any indication of interest in the Customer List (collectively, the "**Interested Parties**") within one business day of filing this Motion and the issuance of by the Court of notice of hearing thereon. The Debtors respectfully submit that the contents of this Motion and any notice of hearing is reasonably calculated to provide interested parties with notice of the Sale and Sale Hearing and an opportunity to respond accordingly. To the extent the notice required by Bankruptcy Rule 2002(a)(2) is not limited or shortened by the Court, the Debtors will cause such additional or further notice as directed by the Court.

**V.**
**Relief Requested and Basis Therefor**

20.     The Debtors respectfully request entry of the Proposed Order (i) authorizing the

Sale of the Customer List other than in the ordinary course of business free and clean of claims

and interests pursuant to the terms and conditions of the APA; (ii) granting the Successful Bidder

the protections of a purchaser in good faith under section 363(m) of the Bankruptcy Code; (iii) if

provided for under the terms and conditions of the Stalking Horse APA, approving payment of the

Break-Up Fee and Expense Reimbursement; and (iv) waiving the fourteen (14)-day stay under

Bankruptcy Rule 6004(h) and any other similar stay.

A.     The Sale of the Customer List Other Than in the Ordinary Course
       Should Be Approved under Section 363(b) of the Bankruptcy Code
       Based on the Sound Business Purpose Test

21.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and

a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to

section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.

*See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Cont'l Air Lines,*

*Inc.*, 780 F.2d 1223 (5th Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel*

*Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).  If a sound business purposes exists for the sale of

property of the estate, a debtor's decision to sell property out of the ordinary course of business

enjoys a strong presumption that in making its business decision the debtor "acted on an informed

basis, in good faith and in an honest belief that the action taken was in the best interests of the

company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith*

*v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

22.     A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984); *see also In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *In re Lionel*, 722 F.2d at 1071.

23.     Based on these principles, the Sale of the Customer List should be authorized and entry into the Successful APA approved as a sound exercise of the Debtors' business judgment for at least four reasons. First, sound business reasons exist for the Sale of the Customer List. As described above, the Debtors are no longer using the Customer List in their business, and placing it in the hands of a third-party purchaser may assist the Debtors' efforts to collect their existing MCA portfolio. Second, the Sale of the Customer List is for a reasonable and fair price that maximizes the value of the Customer List to the Debtors' estates. Before the filing of this Motion, the Debtors engaged in an extensive marketing process resulting in the Stalking Horse APA, which provides for a reasonable and fair price for the Customer List subject to further competitive bidding as contemplated by the Bidding Procedures. After the filing of the Motion and by the time of a hearing on the proposed Sale, the Debtors will have further subjected the opportunity to purchase Customer List to a competitive process in accordance with the Bid Procedures. The proposed Bid Procedures present a controlled, fair and open process that the Debtors believe will encourage bidding only from seriously interested parties who possess the financial and operational capacity to purchase and meaningful use the Customer List. Thus, the sale price of the Customer List will be determined by a competitive process designed to generate the highest and best offer, and the Sale of the Customer List will maximize the value received by the Debtors' estates. Third, the

Debtors will furnish accurate and reasonable notice of the Sale and the opportunity to bid on the Customer List as set forth above.  Fourth, good faith will exist with respect to the Sale of the Customer List.  The Bidding Procedures, among other things, require Qualified Bidders to disclose connections with the Debtors and are designed to facilitate an open, fair and arm's-length process.

24.    Finally, the Sale does not provide for a transfer of "personally identifiable information" within the meaning of sections 101(41A) and 363(b)(1) of the Bankruptcy Code.  The information contained in the Customer List was provided by the Merchants to the Debtors in connection with obtaining an MCA for use in the Merchant's business, not for "personal, family, or household purposes" within the meaning of section 101(41A).  Thus, the limitations in section 363(b)(1) of the Bankruptcy Code relating to transfer of "personally identifiable information" do not apply to the Sale.

25.    Accordingly, the Debtor, in its sound business judgment, believes that the Sale of the Customer List to the Successful Bidder is in the best interest of its estate, and that the Sale free and clear of claims and interests should be authorized and entry into the Successful APA approved.

B.    The Sale of the Customer List Free and Clear of Liens and Other
      Interests Is Authorized by Section 363(f) of the Bankruptcy Code.

26.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another entity's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. See 11 U.S.C. § 363(f).  The language of section 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in section 363(f) is satisfied. *In re Kellstrom*

14

*Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("if any of the five conditions are met, the

debtor has the authority to conduct the sale free and clear of all liens").

27.     The Debtors submit that any interest related to the Customer List satisfies or will

satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code.  Among others,

to the extent that any lien or interest holder does not object to the proposed Sale, that entity or

person should be deemed to have consented to the relief sought herein, thus satisfying section

363(f)(2) of the Bankruptcy Code. *See In re DeCelis*, 349 B.R. 465, 470 (Bankr. E.D. Va. 2006)

("[L]ack of objection (provided of course there is notice) counts as consent. It could not be

otherwise; transaction costs would be prohibitive if everyone who might have an interest in the

bankrupt's assets had to execute a formal consent before they could be sold.") (quoting

Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002)).   Accordingly, the

Debtors requests authority to convey the Customer List to the Successful Purchaser free and clear

of all claims and interests.

C.     The Successful Bidder Should Be Entitled to the
       Protections of a Good Faith Purchaser Under Section 363(m).

28.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or

modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or

lease of property does not affect the validity of a sale or lease under such authorization to an entity

that purchased or leased such property in good faith."   11 U.S.C. § 363(m).   Although the

Bankruptcy Code does not define who is a good faith purchaser, courts have held that a good faith

purchaser is "one who purchases in 'good faith' and for 'value.'" *In re Abbotts Dairies*, 788 F.2d

143, 147 (3d Cir. 1986). To constitute a lack of good faith, a party's conduct in connection with

the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the

trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

29.     The Debtors submit that the Sale and the Successful APA is the product of good faith, arm's-length negotiations.  The Debtors further submit that there is no indication of fraud, collusion or improper insider dealing.  Accordingly, the Debtors request that the Court enter an order entitling the Successful Bidder to the full protections of section 363(m) of the Bankruptcy Code as a good faith purchaser of the Customer List.

D.     The Break-Up Fee and Expense Reimbursement
       Should Be Approved if the Sale Closes to Another Buyer

30.     The Debtors have agreed in the Stalking Horse APA to pay the Stalking Horse Bidder the Break-Up Fee and Expense Reimbursement if the Sale of the Customer List closes to another party.  The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking-horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."  *Id.* (internal citations omitted). Thus, the use of break-up fees and expense reimbursements have become an established practice in chapter 11 cases.

31.     Indeed, break-up fees and expense reimbursements are a normal and, in many cases, a necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

16

"Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets…. In fact, because the … corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value." *In re Integrated Resources, Inc.*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992) (emphasis added). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted); *see also Integrated Resources*, 147 B.R. at 660-61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'I Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's ... due diligence."). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O 'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).

32.     The Debtors believe that the allowance of the Break-Up Fee and Expense Reimbursement is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse APA will establish a floor for further bidding that may increase the consideration given for the Customer List. Here, the Break-Up Fee and Expense Reimbursement are a critical component of the Stalking Horse Bidder's commitment. The Stalking Horse Bidder has expended time and resources negotiating, drafting, and performing due diligence activities, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The parties negotiated the requested Break-Up Fees and Expense Reimbursement in good faith and at arm's-length. As a result, by agreeing to the Break-Up Fee and Expense Reimbursement, the Debtors

ensured that their estates would have the benefit of the transactions with the Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

E.     A Waiver of the Fourteen Day Waiting Period Under
       <u>Bankruptcy Rule 6004(h) and Any Similar Rule is Appropriate</u>.

33.     In order to facilitate the prompt disposition of the Customer List, a waiver of the provisions of Bankruptcy Rules 6004(h) and any similar rule is appropriate.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtors request that the Order be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and any similar stay are waived.

34.     The waiver of these provisions will result in a more rapid closing of the Sale, thereby providing greater certainty to prospective bidders and lessening the expense of the Sale process.  Accordingly, a waiver of these provisions is appropriate.

**WHEREFORE**, the Debtors respectfully requests the entry of the Proposed Order (i) authorizing the Sale of the Customer List other than in the ordinary course of business free and clean of claims and interests pursuant to the terms and conditions of the APA; (ii) granting the Successful Bidder the protections of a purchaser in good faith under section 363(m) of the Bankruptcy Code; (iii) if provided for under the terms and conditions of the Stalking Horse APA, approving payment of the Break-Up Fee and Expense Reimbursement; and (iv) waiving the fourteen (14)-day stay under Bankruptcy Rule 6604(h) and any other similar stay.

Dated:  December 18, 2018

Respectfully submitted,

GREENBERG TRAURIG, LLP.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Phone:  305-579-0500
Fax:  305-579-0717

By:  */s/ John R. Dodd*

Paul J. Keenan, Jr.
Fla. Bar. No. 594687
keenanp@gtlaw.com

John R. Dodd
Fla. Bar No. 38091
doddj@gtlaw.com

*Counsel for the Debtors*

**<u>Exhibit A</u>**

**<u>Sale Order</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| 1 GLOBAL CAPITAL LLC, *et al.*,[1] | Case No. 18-19121-RBR |
| Debtors. | (Jointly Administered) |

**ORDER APPROVING (A) SALE OF CUSTOMER LIST OTHER THAN IN THE
ORDINARY COURSE OF BUSINESS FREE AND CLEAR OF LIENS AND
(B) GRANTING RELATED RELIEF**

This matter came before the Court for a hearing on January ___, 2019, at __:__ _.m. (the

"**Sale Hearing**"), upon the *Motion for Authority to Sell Customer List Other Than in the*

*Ordinary Course of Business Free and Clear of Claims and Interests* [ECF No. ___] (the "**Sale**

---

[1]    The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtors' federal tax identification number, if applicable, are:  1 Global Capital LLC, 1250 E. Hallandale Beach Blvd., Suite 409, Hallandale Beach, FL 33009 (9517); and 1 West Capital LLC, 1250 E. Hallandale Beach Blvd., Suite 409, Hallandale Beach, FL 33009 (1711).

**Motion**") filed by the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") and the *Order (A) Granting* Ex Parte *Motion of the Debtors to Limit and Shorten Notice of Motion for Authority to Sell Customer List Other Than in the Ordinary Course of Business Free and Clear of Claims and Interests; and (B) Scheduling Sale Hearing* [ECF No. ___] (the "**Notice Order**"), for an order under 11 U.S.C. §§ 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**"), and Rule 6004 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**") (i) approving entry into that certain Asset Sale and Purchase Agreement attached as **Exhibit A** hereto (the "**APA**") between the Debtors and _____ (the "**Successful Bidder**" or "**Purchaser**"); (ii) the sale (the "**Sale**") of the Customer List (as defined in the APA) other than in the ordinary course of business free and clean of claims and interests pursuant to the terms and conditions of the APA; (iii) granting the Successful Bidder the protections of a purchaser in good faith under section 363(m) of the Bankruptcy Code; (iv) if provided for under the terms and conditions of that certain Asset Sale and Purchase Agreement, dated as of December 11, 2018 (the "**Stalking Horse APA**"), approving payment of the Break-Up Fee and Expense Reimbursement (as defined in the Stalking Horse APA); and (iv) waiving the fourteen (14)-day stay under Bankruptcy Rule 6004(h) and any other similar stay.

The Court has reviewed the Sale Motion and Notice Order, considered all of the proceedings on the record at the Sale Hearing, including the proffers of evidence made on the record at the Sale Hearing and the argument of counsel. The Court has also considered the record in this case. After due deliberation and good and sufficient cause existing, the Court makes the following findings of fact:

2

A.      This Court has jurisdiction over the Sale Motion and the transactions contemplated by the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.      The Debtors solicited the highest or otherwise best offer for the Customer List in accordance with bidding procedures set forth in the Sale Motion (the "**Bidding Procedures**").   In accordance with the Bidding Procedures, the Successful Bidder timely submitted a bid, and was determined to be a Qualified Bidder (within the meaning of the Bidding Procedures).  The Debtors conducted an auction on January ___, 2019 (the "**Auction**").  At the Auction, the Successful Bidder submitted the final bid set forth in the terms and conditions of the APA, representing, in the Debtors' business judgment, the highest and best offer received for the Customer List.

C.      The Debtors have provided all interested parties (including all parties asserting claims or interests in the Customer List) with notice of the Sale Motion, the Sale Hearing, and the Auction, in accordance with sections 102(1), 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002(a) and 6004(a), as modified by the Notice Order.  This notice is due, proper and sufficient notice to provide affected parties adequate opportunity to determine that their rights are to be affected and afforded such parties an opportunity to object to the sale of the Customer List at the Sale Hearing.  No additional or further notice is necessary or required.

D.      The Debtors conducted the sale process in compliance with the Bidding Procedures, the Bankruptcy Code and all other orders entered in this case.  Bidding on the Customer List and the Auction were conducted in a non-collusive, open, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a higher or otherwise best offer for the Customer List.  In their sound business judgment, the Debtors

have determined that the bid submitted by the Successful Bidder at the Auction represented the highest or otherwise best offer for the Customer List.

E.    The Debtors (i) have full corporate power and authority to execute and consummate the APA on behalf of the Debtors, and all related documents, and the sale of the Customer List has been duly and validly authorized by all necessary corporate action of the Debtors; and (ii) no consents or approvals, other than those expressly provided for in the APA, are required to consummate the transactions contemplated by the APA.

F.    The Debtors have the ability to convey the Customer List to the Purchaser on the terms and conditions of this Order and the APA.

G.    The Debtors have good business reasons to sell the Customer List.

H.    Neither the Purchaser nor any of its affiliates is an "insider" or "affiliate" of the Debtors, as those terms are defined in 11 U.S.C. § 101.

I.    The Debtors and the Purchaser proposed, negotiated and entered into the APA without collusion, in good faith and at arms' length bargaining positions.  The Debtors and the Purchaser have not engaged in any conduct that would cause or permit the APA to be avoided under 11 U.S.C. § 363(n).

J.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

K.    The consideration the Purchaser will give the Debtors for the Customer List pursuant to the APA (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Customer List; and (iii) constitutes reasonably equivalent value.

L.    The transfer of the Customer List to the Purchaser pursuant to the APA will be a legal, valid, and effective transfer of the Customer List.  The transfer of the Customer

List to the Purchaser indefeasibly will vest the Purchaser with good and valid title in and to the Customer List free and clear of any Claims (as defined below).  Any Claim in or against the Debtors, its insiders, or the Customer List will attach to the net proceeds of the sale with the same effect, validity, enforceability and priority of such Claims, if any, as such Claims had against the Customer List before the sale contemplated hereby, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Claims.

M.    The sale and transfer of the Customer List in accordance with the terms and conditions of the APA will be free and clear of all Claims.

N.    Except as expressly set forth in the APA, the Purchaser will have no responsibility for any liability, Claim or other obligation of or against the Debtors related to the Customer List by virtue of the transfer of the Customer List.  The Purchaser will not be deemed, as a result of any action taken in connection with the purchase of the Customer List, (i) to be a successor to the Debtors, (ii) to have, *de facto* or otherwise, merged with or into the Debtors or (iii) to be liable for any tax for which the Debtors is liable.  The Purchaser does not acquire or assume any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the APA.

O.    A sale on the terms and conditions of the APA, including without limitation, entry of an order providing a sale free and clear of Claims and providing that the Purchaser is not a successor of the Debtors, is consistent with the Bankruptcy Code and promotes the policies of the Bankruptcy Code to maximize value.  Absent such finding, the Purchaser would be unwilling to pay the price for the Customer List as provided for in the APA.

P.    The Court's approval of the APA is in the best interests of the Debtors, its estates and its creditors.  Accordingly, it is

5

**ORDERED AND ADJUDGED THAT:**

1.      The Sale Motion is granted.

2.      All objections to the entry of this order or to the relief granted and requested in the Sale Motion that have not been withdrawn, waived or settled at or before the Sale Hearing are denied and overruled on the merits.

3.      The APA is approved in all respects.  Pursuant to 11 U.S.C. §§ 105(a) and 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the APA) to consummate the transactions on behalf of the Debtors, including transferring and conveying the Customer List to the Purchaser pursuant to and in accordance with the terms and conditions of the APA.

4.      Pursuant to 11 U.S.C. § 363(b), (f) and (m), the Debtors are authorized, directed and empowered to consummate and implement fully the transactions on behalf of the Debtors, together with all additional instruments and documents that may be necessary to implement the APA.  The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Customer List to the Purchaser, free and clear of all Claims.

5.      Any agreements, documents, or other instruments executed in connection with the APA may be modified, amended, or supplemented by the parties in accordance with the terms of the APA without further order of the Court, *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

6.      The Customer List will be transferred to the Purchaser upon Closing of the sale free and clear of all Claims pursuant to 11 U.S.C. §§ 105(a) and 363(f).

7.     The terms and conditions of the APA provide the Debtors with reasonably equivalent value and fair consideration for the Customer List under the Bankruptcy Code and applicable non-bankruptcy law.  For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

8.     The Purchaser has and will have acted in good faith in purchasing the Customer List under APA as that term is used in 11 U.S.C § 363(m).  For that reason, any reversal or modification of the Order on appeal will not affect the validity of the sale to the Purchaser.

9.     The transfer of the Customer List to the Purchaser will not result in (a) the Purchaser having any liability for any Claim against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the APA and this Order.

10.     The Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Customer List, including but not limited to obligations to governmental entities or taxing authorities.

**11.**     Except as expressly stated in the APA and this Order, the transfer of the Customer List to the Purchaser on the Closing Date (as defined in the APA) shall be free and clear of any and all liens, encumbrances, claims (as defined in Section 101(5) of the Bankruptcy Code), charges, defenses, off-sets, recoupments and interests thereon and there against of whatever type or description, including, without limitation, restrictions on or conditions to transfer or assignment, liens, taxes and assessments already due, mortgages, security interests, pledges, hypothecations, control agreements, equities and other claims and interests (all such claims and interests described in this paragraph being referred to in this Order as the "**Claim**" or

7

"**Claims**"), having arisen, existed or accrued prior to and through the Closing Date, whether direct or indirect, monetary or non-monetary, arising at law or in equity, contract or tort, absolute or contingent, matured or unmatured, voluntary or involuntary, liquidated or unliquidated, of, by or against the Debtors, insiders of the Debtors or the Customer List.

12.     The purchase of the Customer List by the Purchaser shall not cause the Purchaser or its affiliates, successors or assigns or their respective properties to be deemed a successor in any respect of the Debtors' business within the meaning of any laws, rules or regulations relating to any tax, revenue, pension, benefit, ERISA, environmental, labor, employment, products liability or other law, rule or regulation of any federal, state or local government.

13.     Upon Closing, this Order constitutes a full and complete general assignment, conveyance and transfer of the Customer List and/or a deed or a bill of sale transferring good and marketable title in the Customer List to the Purchaser on the Closing Date free and clear of all Claims.  Each and every federal, state, and local governmental agency or department is directed to accept this Order as such an assignment, deed and/or bill of sale or any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  This Order shall be accepted for recordation on or after the Closing Date as conclusive evidence of the free and clear, unencumbered transfer of title to the Customer List to the Purchaser.

14.     This Court retains exclusive jurisdiction to (a) enforce and implement the APA and any other agreements and instruments executed in connection with the APA, (b) compel delivery of possession of the Customer List to the Purchaser, (c) resolve any disputes,

controversies or claims arising out of or relating to the APA, and (d) interpret, implement and enforce the provisions of this Order.

15.     The terms and provisions of the APA and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, its estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any chapter 11 plan subsequently confirmed in this case, or any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which plan or trustee such terms and provisions likewise will be binding.

16.     After the Closing Date, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Customer List, or (b) collect or attempt to collect from the Purchaser, or any of its affiliates, any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Claims or (ii) for any period commencing before and concluding prior to or on the Closing Date or any pre-Closing portion of any period commencing before the Closing Date and concluding after the Closing, or (iii) assessed prior to and payable after the Closing Date, except as otherwise provided in the APA.  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the APA.

17.     [The Debtors shall pay Advance Service Group LLC d/b/a In Advance Capital the Break-Up Fee and Expense Reimbursement (as defined in the Stalking Horse APA) within two (2) business days of the closing of the Sale of the Customer List to a third party, *provided* that the such payment is in accordance with the terms and conditions of the Stalking Horse APA.]

18.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the APA and this Order, the provisions contained in the Order will control.

19.    Notwithstanding Fed. R. Bankr. P. 6004(h) or any similar rule, this Order will take effect immediately upon entry.

20.    To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

*Submitted by*:

John R. Dodd
Fla. Bar. No. 38091
keenanp@gtlaw.com
GREENBERG TRAURIG, LLP
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone:  (305) 579-0500
Facsimile:  (305) 579-0717

Counsel for the Debtors
and Debtors-in-Possession

(The Claims and Noticing Agent is directed to serve copies of this Order upon the Master Service List and to file a Certificate or Affidavit of Service with the Court.)

10

**EXHIBIT A**
**(APA)**
**[To Be Submitted with Final Form of Sale Order]**

**<u>Exhibit B</u>**

**<u>Stalking Horse APA</u>**

Execution Version

ASSET SALE AND PURCHASE AGREEMENT

Dated as of December 11, 2018

among

1 GLOBAL CAPITAL LLC,

and

ADVANCE SERVICE GROUP LLC D/B/A IN ADVANCE CAPITAL

# TABLE OF CONTENTS

Page

1. SALE AND PURCHASE .................................................................................................... 1

   1.1    Purchased Assets ........................................................................................... 1
   1.2    Excluded Assets ............................................................................................ 1
   1.3    Assurances .................................................................................................... 1

2. NON-ASSUMPTION OF OBLIGATIONS ..................................................................... 2

   2.1    Non-Assumption of All Liabilities and Obligations .................................. 2

3. CONSIDERATION; CLOSING ....................................................................................... 2

   3.1    Deposit ......................................................................................................... 2
   3.2    Commission Fees ......................................................................................... 2
   3.3    Advance Payment ......................................................................................... 3
   3.4    Closing ......................................................................................................... 4

4. REPRESENTATIONS AND WARRANTIES OF SELLER ............................................ 5

   4.1    Organization ................................................................................................. 5
   4.2    Authority; Binding Effect ............................................................................ 5
   4.3    The Purchased Assets .................................................................................. 5
   4.4    Disclaimer of Representations ..................................................................... 5

5. REPRESENTATIONS AND WARRANTIES OF BUYER ............................................ 5

   5.1    Organization ................................................................................................. 6
   5.2    Authority; Binding Effect ............................................................................ 6

6. BANKRUPTCY COURT PROCEEDINGS ..................................................................... 6

   6.1    Bankruptcy Court Matters ........................................................................... 6

7. COVENANTS ................................................................................................................... 7

   7.1    Conduct of Business .................................................................................... 7
   7.2    Reasonable Best Efforts ............................................................................... 8
   7.3    Access to Information .................................................................................. 8
   7.4    "Coded" Lists ............................................................................................... 9
   7.5    No "Stacking" by Buyer ............................................................................... 9

8. CONDITIONS TO BUYER'S OBLIGATIONS .............................................................. 9

   8.1    Notice to Customers .................................................................................... 9
   8.2    Absence of Litigation .................................................................................. 9
   8.3    Approval Order ............................................................................................ 9
   8.4    Representations and Warranties ................................................................. 10

TABLE OF CONTENTS
(continued)

9.    CONDITIONS TO SELLER'S OBLIGATIONS ................................................................ 10

  9.1      Absence of Litigation ................................................................ 10
  9.2      Approval Order ................................................................ 10
  9.3      Representations and Warranties ................................................................ 10

10.    MISCELLANEOUS ................................................................ 10

  10.1     Entire Agreements; Modification; Waiver ................................................................ 11
  10.2     Notices ................................................................ 11
  10.3     Binding Effect; Third Parties; Headings ................................................................ 11
  10.4     Consent to Jurisdiction ................................................................ 11
  10.5     Expenses; Transfer Taxes ................................................................ 12
  10.6     Termination ................................................................ 12
  10.7     Certain Definitions ................................................................ 13
  10.8     Severability ................................................................ 14
  10.9     Governing Law ................................................................ 14
  10.10    No Presumption ................................................................ 14
  10.11    Counterparts ................................................................ 14

## ASSET SALE AND PURCHASE AGREEMENT

ASSET SALE AND PURCHASE AGREEMENT, dated as of December 11, 2018 (the "Agreement"), by and among each of 1 GLOBAL CAPITAL LLC, a Florida limited liability company and debtor and debtor in possession under Chapter 11 of the Bankruptcy Code ("Seller"), and ADVANCE SERVICE GROUP LLC D/B/A IN ADVANCE CAPITAL, a New York limited liability company ("Buyer").

Seller is in the business of providing merchant cash advances. Seller is a debtor in possession in cases (collectively, the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") pending in the United States Bankruptcy Court for the Southern District of Florida Fort Lauderdale Division (the "Bankruptcy Court") and under Case No. 18-19121-RBR. Seller desires to sell, and Buyer desires to purchase, subject to the terms and conditions hereof and in accordance with Sections 363(f) and 363(m) of the Bankruptcy Code, the "Purchased Assets" as defined in Section 10.7.

Accordingly, the parties intending to be bound hereby agree as follows:

1.  **SALE AND PURCHASE**

    1.1  **Purchased Assets**

    Subject to the terms and conditions hereof, at the closing referred to in Section 3.4 (the "Closing") Seller shall sell, transfer and assign to Buyer, and Buyer shall purchase and acquire from Seller, the Purchased Assets. In connection therewith, Seller shall transfer to Buyer all of its right, title and interest in and to the Purchased Assets to Buyer at Closing. The date on which the Closing shall occur is hereafter called the "Closing Date."

    1.2  **Excluded Assets**

    Seller and Buyer expressly understand and agree that Seller is not selling, assigning, transferring or conveying to Buyer any of the Seller's assets that are not Purchased Assets, including, without limitation, Seller's right, title or interest in Seller's MCAs, cash and cash equivalents, account receivables, executory contracts, trade names or phone numbers ("Excluded Assets"). Accordingly, at the Closing, Seller shall retain all of its right, title and interest in and to the Excluded Assets.

    1.3  **Assurances**

    After the Closing, for no further consideration, Seller shall perform all such other actions and shall execute, acknowledge and deliver all such other documents as Buyer may reasonably request to vest in Buyer, and protect its right, title and interest in, and enjoyment of, the Purchased Assets or any other obligation of the Seller hereunder, including without limitation causing Seller and each of Seller's Affiliates to cooperate in the prompt transfer to Buyer of any data, information, and records with regard to the Purchased Assets. Buyer shall similarly perform all such other actions and shall execute and deliver all such other documents as Seller may reasonably request to perfect and protect Seller's rights under this Agreement.

2.    NON-ASSUMPTION OF OBLIGATIONS

2.1    Non-Assumption of All Liabilities and Obligations

Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume, pay, perform or discharge or be required directly or indirectly to assume, pay, perform or discharge any obligations or liabilities of Seller, or of any predecessor or affiliate of the Seller, or be bound by any duties, responsibilities, liabilities or obligations of Seller, or of any predecessor or affiliate of the Seller, of any kind or nature (fixed or contingent, known or unknown). Buyer shall not assume or be responsible at any time for any liability, obligation, debt or commitment of Seller, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, or otherwise, including but not limited to any liabilities, obligations, debts or commitments of Seller incident to, arising out of or incurred with respect to, this Agreement and the transactions contemplated hereby. Without limiting the generality of the foregoing, Seller expressly acknowledges and agrees that Seller shall retain, and that Buyer shall not assume or otherwise be obligated to pay, perform, defend or discharge, (a) any liability of Seller for taxes, whether measured by income or otherwise, (b) any liability pertaining to MCAs solicited and/or advanced by Seller before the Closing Date in connection with the Purchased Assets, (c) any liability for customer rebates or adjustments with respect to any preexisting MCAs advanced by the Seller, or (d) any liability or obligation of Seller relating to any default taking place with respect to preexisting MCAs advanced by the Seller.

3.    CONSIDERATION; CLOSING

In consideration of the sale, transfer and conveyance of the Purchased Assets to Buyer, free and clear of any and all Liens, Buyer shall make payments to Seller and the Closing shall take place, as follows:

3.1    Deposit

Subject to the terms and conditions of this Agreement, within two Business Days after full execution of this Agreement, Buyer shall remit a Deposit in the amount of Twenty-Five Thousand Dollars ($25,000) in immediately available funds to be held by Seller.

3.2    Commission Fees

Subject to the terms and condition of this Agreement, including, without limitation, credit of the Advance Payment as set forth in Section 3.3, the Buyer shall pay to Seller

(a)    in connection with the first advance after the Closing Date relating to any MCA originated from the Combined Deals List

(1)    a commission equal to three-percent (3%) of the funded amount advanced by Buyer relating to any MCA originated from the Unique Funded Deals List,

(2)    a commission equal to a twenty-five percent (25%) of any commission received by Buyer in connection with any MCA originated from the Unique Funded Deals List that is brokered by the Buyer,

(3)    a commission equal to three-percent (3%) of the funded amount advanced by Buyer relating to any MCA originated from the Unique Non-Funded Deals List, and

(4)    a commission equal to a twenty-five percent (25%) of any commission received by Buyer in connection with any MCA originated from the Unique Non-Funded Deals List that is brokered by the Buyer; and

(b)    for a period of three (3) years after the Closing Date, in connection with any advance after the first advance described in clause (a) above relating to any MCA originated from the Combined Deals List

(1)    a commission equal to two and one-half percent (2.5%) of the funded amount advanced by Buyer relating to any MCA originated from the Combined Deals List, and

(2)    a commission equal to a twenty percent (20%) of any commission received by Buyer in connection with any MCA originated from the Combined Deals List that is brokered by the Buyer

(the commissions in clauses (a)(1) – (4) and (b)(1) – (2) above, collectively, the "Commission Fees"). The Buyer shall make payment to Seller on the first Business Day of the month the aggregate Commission Fees earned for the prior month commencing with the first month after the month during which the Closing Date occurs.

(c)    In the event a default occurs under an MCA originated or brokered after the Closing Date by Buyer within 30 days of funding such MCA, Buyer may recall any commission paid or to be paid to Seller under clauses (a) and (b) of Section 3.2 of this Agreement relating to the defaulted MCA. If a recalled commission has been disbursed to Seller, Seller shall return the subject commission in full to Buyer within seven (7) days of demand by Buyer. If (i) Seller fails to timely return a disbursed commission as provided in the foregoing sentence or (ii) a recalled commission has not been disbursed, then Buyer may deduct such commissions from presently owed or future commissions owed to Seller. If a defaulted MCA is cured thereafter, Buyer shall pay any recalled or returned commissions to Seller.

3.3    Advance Payment

Subject to the terms and conditions of this Agreement, at Closing, Buyer shall remit

(a)    an advance payment which, together with the Deposit, totals Seventy-Five Thousand Dollars ($75,000) by wire transfer to an account in the United States designated by Seller prior to the date that such payment is due, which be applied to and credited against the commission payable by Buyer pursuant to Section 3.2(a)(1) of this Agreement; and

(b)    an advance payment which totals Thirty Thousand Dollars ($30,000) by wire transfer to an account in the United States designated by Seller prior to the date that such payment is due, which be applied to and credited against the commission payable by Buyer pursuant to Section 3.2(b)(1) of this Agreement

(the advance payments in clauses (a) and (b) above, collectively, the "Advance Payment").

3.4    Closing

Subject to the terms and conditions of this Agreement, the sale and purchase of the Purchased Assets contemplated by this Agreement shall take place at Closing to be held at the offices of Seller's counsel located in Fort Lauderdale, Florida on a date designated by Buyer no later than ten (10) Business Days following the execution and docketing of the Approval Order provided, (i) that no order staying the Approval Order shall be in effect, and (ii) that the Closing shall not occur until all conditions to closing have been satisfied or waived.  With the mutual consent of the parties hereto, the Closing may be modified to such other date and time as the parties may mutually agree.

(a)    At the Closing, subject to the satisfaction or waiver of the conditions to its obligations set forth in this Agreement, Seller shall deliver or cause to be delivered to Buyer:

(1)    A Bill of Sale, in form and substance reasonably satisfactory to Buyer (the "Bill of Sale") together with such assignment agreements and other instruments Buyer may reasonably request to effectuate the transfer of the Purchased Assets, all duly executed by Seller.

(2)    The customer information detailed in Schedule 10.7 (together with any supporting documents).

(3)    The Approval Order.

(4)    Any codes and other technical information necessary or appropriate to "decode" the Coded Purchased Assets List (as defined in Section 7.4 of this Agreement).

(5)    Such other instruments and documents as may be reasonably requested by, and in form and substance reasonably satisfactory to, Buyer in order to effect the transactions contemplated by this Agreement to occur at the Closing.

(b)    At the Closing, subject to the satisfaction or waiver of the conditions to its obligations set forth in this Agreement, Buyer shall deliver or cause to be delivered to Seller:

(1)    The Advance Payment pursuant to Section 3.3, paid by wire transfer of immediately available funds to an account designated by Seller.

(2)    Any codes and other technical information necessary or appropriate to "decode" the Coded Buyer Customer List (as defined in Section 7.4 of this Agreement).

(3)     Such other instruments and documents as may be reasonably requested by, and in form and substance reasonably satisfactory to, Seller in order to effect the transactions contemplated by this Agreement to occur at the Closing.

4.     REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrant to Buyer as follows:

4.1     Organization

Seller was duly incorporated and is a corporation validly existing and in good standing under the laws of the State of Florida.

4.2     Authority; Binding Effect

Subject to issuance of the Approval Order, Seller has full corporate power and authority to execute and deliver this Agreement and the other instruments and documents required or contemplated by this Agreement to be executed and delivered by them, to perform their obligations hereunder and thereunder and to consummate the transactions provided for herein and therein.  This Agreement has been duly executed by Seller, and the other instruments and documents required or contemplated by this Agreement to be executed by Seller will be duly executed by each of them as so required or contemplated and when so executed, subject to obtaining the Approval Order, constitutes or will constitute their valid and binding obligation, enforceable against them in accordance with the terms thereof (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally or by the principles governing the availability of equitable remedies).

4.3     The Purchased Assets

Seller owns the Purchased Assets and, subject to issuance of the Approval Order, Seller has all right, power and authority to sell, convey, assign, transfer and deliver the Purchased Assets to Buyer in accordance with the terms of this Agreement.  The Seller is the sole owner of the customer information constituting the Purchased Assets and no other party has any ownership interest therein.  The Purchased Assets are free and clear of all Liens.  At Closing, the Purchased Assets will be delivered to Buyer free and clear of all Liens.

4.4     Disclaimer of Representations

Except as otherwise expressly provided herein, the Assets are being sold on an "AS IS" "WITH ALL FAULTS" basis, and no other representation or warranty has been made by Seller with respect to the Seller, its business, the Purchased Assets or otherwise in connection with the transactions contemplated herein.    ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED.

5.     REPRESENTATIONS AND WARRANTIES OF BUYER

- 5 -

Buyer represents and warrants to Seller as follows:

### 5.1    Organization

Buyer is duly formed and is a limited liability company validly existing and in good standing under the laws of the State of New York and has the corporate power and authority to own or lease its properties and assets and to carry on its business in the manner in which such business is now being conducted and as proposed to be conducted after the Closing.

### 5.2    Authority; Binding Effect

Buyer has full corporate power and authority to execute and deliver this Agreement and the other instruments and documents required or contemplated by this Agreement to be executed or delivered by it, to perform its obligations hereunder and thereunder and to consummate the transactions provided for herein and therein.  Such execution, delivery, performance and consummation do not and will not (i) contravene any provision of the certificates of formation or any operating or member agreements of Buyer, (ii) contravene or conflict with, require any consent, approval or waiver of any party (other than Buyer) to, result in a breach of or loss of benefits to Buyer under, or entitle and party (with notice or the passage of time or both) to terminate, accelerate any obligation under, materially alter the terms of or call a default with respect to, any agreement or instrument to which Buyer is a party or by which any of its respective properties or assets are bound, (iii) result in the creation of a lien or encumbrance upon such properties or assets, (iv) result in any violation by Buyer of any law, rule or regulation applicable to it, (v) violate or require any consent or approval under any judgment, injunction or decree of any court or governmental authority applicable to Buyer or (vi) require any consent or approval of or notice to or filing, registration or qualification with, any court or governmental authority.  This Agreement has been duly executed by Buyer and constitutes, and the other instruments and documents required or contemplated by this Agreement to be executed by Buyer will be duly executed by it as required or contemplated by this Agreement and when so executed will constitute, subject to issuance of the Approval Order, the valid and binding obligation of Buyer enforceable against Buyer in accordance with the terms thereof (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally or by the principles governing the availability of equitable remedies).

## 6.    BANKRUPTCY COURT PROCEEDINGS

### 6.1    Bankruptcy Court Matters

(a)    The Buyer acknowledges and agrees that the Seller's duties and obligations under this Agreement are subject to higher and better offers for the Purchased Assets solicited in accordance with auction and related procedures set forth in the Sale Motion (as defined below).  Subject to and in accordance with the terms and conditions of this Agreement, the Seller agrees to seek approval in the Sale Motion for the Seller to pay Buyer a break-up fee of Fifteen Thousand Dollars ($15,000) (the "Break-Up Fee"), as compensation and consideration for the time, effort and expenses incurred by Buyer in conducting due diligence with respect to the transactions contemplated by this Agreement and negotiating, drafting and executing this

Agreement, in the event that the Purchased Assets are sold to a third party pursuant to an Approval Order (as defined below) from the proceeds of such sale.

(b)     The Parties agree that any sales procedures relating to the disposition of the Purchased Assets will provide that, among other things, (i) Buyer shall be a qualified bidder, (ii) any initial overbid shall be at least Twenty-Five Thousand Dollars ($25,000) greater than the consideration set forth in this Agreement (including, without limitation, all cash, non-cash consideration and assumed liabilities) as determined by Seller in its sole and absolute discretion, (iii) any minimum subsequent overbid amount shall be determined by Seller in its sole and absolute discretion, and (iv) the highest and best bid shall be determined by Seller in its sole and absolute discretion (subject to approval by the Bankruptcy Court at any hearing to approve the sale of the Purchased Assets).

(c)     Promptly following the date hereof (and in no event later than five (5) Business Days thereafter), Seller shall file a motion with the Bankruptcy Court (the "Sale Motion"), reasonably acceptable to Buyer, requesting the issuance and entry of an order (the "Approval Order") that, among other things, (i) approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and the agreements and instruments contemplated hereby and, authorizes Seller to proceed with the transactions contemplated hereby and thereby, (ii) includes a specific finding that Buyer is a good faith purchaser of the Purchased Assets within the meaning of Section 363(m) of the Bankruptcy Code, and (iii) states that the sale of the Purchased Assets to Buyer shall be free and clear of any and all Liens pursuant to Section 363(f) of the Bankruptcy Code. Following the filing of the Sale Motion, Seller shall use commercially reasonable efforts to obtain entry of the Approval Order and Seller shall use commercially reasonable efforts to have the Approval Order; provided, however, Buyer at its option may terminate this Agreement by providing written notice to Seller if the Approval Order is not entered by February 1, 2019. Buyer shall use commercially reasonable efforts to cooperate with and assist Seller in its efforts to obtain the approval and entry of the Approval Order.

(d)     From and after the date hereof, Seller shall not take any action, or fail to take any action, which action or failure to act would reasonably be expected to (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Buyer's rights hereunder), or (B) the entry of a stay pending appeal, *provided* that nothing contained herein shall require Seller to take any actions or omit to take any action which in the opinion of their legal counsel would result in a breach of their fiduciary duties.

7.     COVENANTS

The parties covenant and agree as follows:

7.1     Conduct of Business

During the period from the date of this Agreement to the Closing Date and except as may be first approved by the Buyer or as is otherwise permitted or required by this Agreement, Seller agrees to:

(a)    conduct its business in the ordinary course and in compliance with applicable laws, including without limitation retaining the Purchased Assets in a manner consistent with past practice;

(b)    refrain from granting any Liens on the Purchased Assets;

(c)    refrain from transferring any Purchased Assets or granting any right under any of the Purchased Assets;

(d)    refrain from knowingly taking or failing to take any action that would cause or permit the representations and warranties made in Article 4 hereof to be inaccurate in any material respect at the time of Closing;

(e)    refrain from selling or disposing of any Purchased Assets, without Buyer's consent, other than as provided in the Sale Motion and approved by the Bankruptcy Court;

(f)    comply in all material respects with all applicable legal requirements and perform all obligations under its licenses and contracts and leases; and

(g)    not enter into any agreement, whether or not in writing, inconsistent with (a) through (f) above.

7.2    Reasonable Best Efforts

Each of the parties hereto agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable to consummate and make effective on the Closing Date, in the most expeditious manner practicable, the sale of Purchased Assets by Seller to Buyer, and Buyer's purchase thereof.

7.3    Access to Information

(a)    From and after the Closing, Seller shall afford to Buyer and its authorized accountants, counsel and other designated representatives reasonable access (including using reasonable efforts to give access to persons or firms possessing information) and duplicating rights during normal business hours to all records, books, instruments, computer data and other data and information (collectively, "*Information*") within Seller's possession relating to the Purchased Assets insofar as such access is reasonably required by Buyer. Similarly, Buyer shall afford to Seller and its authorized accountants, counsel and other designated representatives reasonable access (including using reasonable efforts to give access to persons or firms possessing information) and duplicating rights during normal business hours to Information within Buyer's possession and to the reasonable assistance of Buyer's personnel with respect to matters relating to the Purchased Assets insofar as such access or assistance is reasonably required by a Seller. Information may be requested under this Section 7.3 for, without limitation,

audit, accounting, claims, litigation and tax purposes, as well as for purposes of fulfilling disclosure and reporting obligations and for performing this Agreement and the transactions contemplated hereby.

(b)     Between the date hereof and the Closing, Seller shall: (i) promptly after request by Buyer afford the officers, employees, auditors, attorneys and other authorized representatives of Buyer reasonable access during normal business hours to files, books, records, documents and other information (excluding accountants proprietary information) of Seller relating solely to the Purchased Assets; (ii) make available for inspection and copying by Buyer, or any such representatives of Buyer, true and complete copies of any documents relating to the foregoing; and (iii) make available for inspection each of the Purchased Assets and all records reasonably related thereto.

7.4     "Coded" Lists

No later than one (1) Business Day after the date that this Agreement is fully executed, Buyer shall deliver to Seller Buyer's "coded" customer list (the "Coded Buyer Customer List"), and, to the extent not already delivered, Seller shall deliver to Buyer a "coded" list of the Purchased Assets (the "Coded Purchased Assets List").

7.5     No "Stacking" by Buyer

Without the prior written consent of Seller, Buyer shall not make or fund an MCA to a merchant on the Funded Deals List unless any prior MCA of that Merchant made or funded by Seller has been fully paid and collected by Seller.

8.     CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer required to be performed by it at the Closing shall be subject to the satisfaction, at or prior to the Closing as the case may be, of each of the following conditions, each of which may be waived by Buyer as provided herein except as otherwise required by applicable law:

8.1     Notice to Customers

Seller shall provide notice to customers whose information are included in the Purchased Assets of the sale, transfer, and conveyance of the Purchased Assets to the Buyer.

8.2     Absence of Litigation

No order, stay, injunction or decree of any court of competent jurisdiction shall be in effect that prevents or delays the consummation of any of the transactions contemplated hereby to occur at the Closing.

8.3     Approval Order

The Bankruptcy Court shall have entered the Approval Order, which is final and not stayed, and such Approval Order includes findings and conclusions that the sale of the

Purchased Assets is free and clear of claims and interests pursuant to Section 363(f) of the Bankruptcy Code and that the sale was conducted in good faith pursuant to Section 363(m) of the Bankruptcy Code.

8.4    Representations and Warranties

The representations and warranties of Seller contained in this Agreement (A) that are not qualified as to "materiality" shall be true and correct in all material respects on and as of the date hereof and the Closing Date and (B) that are qualified as to "materiality" shall be true and correct on and as of the date hereof and the Closing Date, other than such representations and warranties that are made as of another date, in which case such representations and warranties shall be true and correct in all material respects or true and correct, as the case may be, on and as of such other date, and the covenants and agreements contained in this Agreement to be complied with by the Seller at or before the Closing shall have been complied with in all material respects.

9.    CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller required to be performed by them at the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, each of which may be waived by them as provided herein except as otherwise provided by applicable law:

9.1    Absence of Litigation

No order, stay, injunction or decree of any court of competent jurisdiction shall be in effect that prevents or delays the consummation of any of the transactions contemplated hereby to occur at the Closing.

9.2    Approval Order

The Bankruptcy Court shall have issued the Approval Order, and the Approval Order shall be final and not subject to any stay.

9.3    Representations and Warranties

The representations and warranties of Buyer contained in this Agreement (A) that are not qualified as to "materiality" shall be true and correct in all material respects on and as of the date hereof and the Closing Date and (B) that are qualified as to "materiality" shall be true and correct on and as of the date hereof and the Closing Date, other than such representations and warranties that are made as of another date, in which case such representations and warranties shall be true and correct in all material respects or true and correct, as the case may be, on and as of such other date, and the covenants and agreements contained in this Agreement to be complied with by Buyer at or before the Closing shall have been complied with in all material respects.

10.    MISCELLANEOUS

The following additional provisions are part of this Agreement:

### 10.1   Entire Agreements; Modification; Waiver

This Agreement (including the Exhibits and Schedules hereto) sets forth the entire agreement and understanding among the parties with respect to the transactions contemplated hereby and supersedes all agreements and understandings with respect to the transactions contemplated hereby entered into prior to the execution hereof. This Agreement may be modified only by a written instrument duly executed by or on behalf of each party. No breach of any covenant, agreement, warranty or representation or failure to satisfy any condition shall be deemed waived unless expressly waived in writing by and on behalf of the party who might assert such breach or such condition.

### 10.2   Notices

Any notice, direction or other advice or communication required or permitted to be given hereunder shall be in writing and shall be given by certified mail or overnight delivery via Federal Express or similar service against receipt to the party to whom it is to be given or by electronic mail, at such party's address set forth under its name on the signature page of this Agreement or to such other address as the party shall have furnished in writing to the other party in accordance with the provisions of this Section 10.2. Any notice, direction or other advice or communication shall be deemed to have been given as of the date received by electronic mail or as of the date so delivered against receipt, on the next business day when sent by overnight service or five days after the date so mailed.

### 10.3   Binding Effect; Third Parties; Headings

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, which term shall include any successor by merger or consolidation, and permitted assigns and their respective successors, except that none of the parties to this Agreement shall be entitled to assign this Agreement or any interest herein or right hereunder and any such purported assignment shall be void. Nothing in this Agreement is intended by the parties or shall act to confer any right or remedy on any third party. The Article and Section headings of this Agreement are for convenience of reference only and do not form a part hereof and do not in any way modify, interpret or construe the intentions of the parties.

### 10.4   Consent to Jurisdiction

Each party hereto, hereby consents to, and confers exclusive jurisdiction upon, the Bankruptcy Court of the Southern District of Florida, and appropriate appellate courts therefrom, over any action, suit or proceeding arising out of or relating to this Agreement. Each party hereto hereby waives, and agrees not to assert, as a defense in any such action, suit or proceeding that it is not subject to such jurisdiction or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that this Agreement may not be enforced in or by said courts or that its property is exempt or immune from execution, that the suit, action or proceeding is brought in an inconvenient forum, or that the venue of the suit, action or proceeding is improper. Service of process in any such action, suit or proceeding may be served

on any party anywhere in the world, whether within or without the State of Florida, provided that notice thereof is provided pursuant to provisions for notice under this Agreement.

### 10.5    Expenses; Transfer Taxes

Except as otherwise specifically provided herein, each party shall bear its own fees and expenses (including the fees of any attorneys, accountants, investment bankers or others engaged by such party) in connection with the transactions contemplated hereby, whether or not such transactions are consummated.  Buyer shall pay any sales, use, registration, transfer, documentary or other taxes or similar fees imposed on or with respect to the transfer of the Assets.

### 10.6    Termination

This Agreement may be terminated at any time prior to the Closing:

(i)    By mutual consent of Buyer and Seller.

(ii)    By Buyer, if the Closing shall not have taken place on or prior to the earlier of (A) the 10th Business Day after the Approval Order is entered by the Bankruptcy Court and (B) March 1, 2019, or such later date as shall have been approved by Buyer and Seller, *provided, however,* that the right to terminate this Agreement pursuant to this Section 10.6(ii) shall be suspended as to Buyer if the Buyer's failure to fulfill any material obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to such date.

(iii)    By Buyer if any of the Sale Motion or Approval Order are not acceptable to Buyer in its reasonable discretion, including that the Sale Motion does not request approval of the Break-Up Fee as set forth in this Agreement.

(iv)    By Seller if any event shall occur that shall render the satisfaction of any condition to the obligations of Seller set forth in Article 9 impossible and such condition has not been waived by Seller.

(v)    By Buyer if any event shall occur that shall render the satisfaction of any condition to the obligations of Buyer set forth in Article 8 impossible and such condition has not been waived by Buyer.

(vi)    By a party hereto as otherwise expressly provided in this Agreement.

(vii)    By Seller, if the Closing shall not have taken place on or prior to March 1, 2019, or such later date as shall have been approved by Buyer and Seller, *provided, however,* that the right to terminate this Agreement pursuant to this Section 10.6(vii) shall be suspended as to the Seller in the event that the Seller's failure to fulfill any material obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to such date.

(viii)    By Buyer in the event that a party other than Buyer is approved by the Bankruptcy Court as having made the highest and best offer for the Purchased Assets and the sale of the Purchased Assets closes to such other party.

If Buyer or Seller shall terminate this Agreement pursuant to the provisions hereof, such termination shall be effected by notice to the other party specifying the provision hereof pursuant to which such termination is made.    Except for any breach of this Agreement and for the obligations contained in this Section 10.6, upon the termination of this Agreement pursuant to Section 10.6 hereof, this Agreement shall forthwith become null and void and none of the parties hereto or any of their respective officers, directors, employees, agents, consultants, stockholders, affiliates or principals shall have any liability or obligation hereunder or with respect hereto; *provided*, that, in any such case, the Deposit shall be returned to Buyer within two Business Days after such termination; *provided*, *however*, that, in the event of a termination under Section 10.6(viii), the Break-Up Fee shall be due and payable to Buyer on the closing of a transaction with regard to the Purchased Assets out of the proceeds thereof.

10.7    Certain Definitions

The following terms shall have the respective meanings indicated below for purposes of the Agreement:

"*Affiliate*" of a specified person shall mean a person directly or indirectly controlling, controlled by, or under common control with, such other Person.  For the purposes of this definition, "control" when used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Business Day*" shall mean any day other than a Saturday, Sunday or other day on which banks in Miami, Florida are required to or may be closed.

"*Combined Deals List*" shall mean the Funded Deals List and the Non-Funded Deals List, collectively.

"*Funded Deals List*" shall mean the list of customers and the data fields respecting such customers' information relating to MCAs that were fully funded and made available to the individuals and or entities applying for such MCAs as described in Schedule 10.7 under the subheading "Funded Deals".

"*Lien*" shall mean any liens, pledges, security interests, charges, restrictions on or conditions to transfer, voting or exercise or enjoyments or any rights or beneficial interest, conditional sale agreement, or other title retention agreement, lease, mortgage, claims, encumbrances, restrictions and equities of any nature whatsoever.

"*MCA*" shall mean merchant cash advance.

"*Non-Funded Deals List*" shall mean the list of customers and the data fields respecting such customers' information relating to MCAs that were applied for but not fully

funded nor made available to the individuals and/or entities applying for such MCAs as described in Schedule 10.7 under the subheading "Non-Funded Deals".

"*Purchased Assets*" shall mean the Funded Deals List and Non-Funded Deals List, collectively.

"*Unique Funded Deals List*" shall mean the Funded Deals List exclusive of the customers in the Coded Buyer Customer List after decoding with the codes and other information delivered in connection with Section 3.4(b) of this Agreement.

"*Unique Non-Funded Deals List*" shall mean the Non-Funded Deals List exclusive of the customers listed in the Coded Buyer Customer List after decoding with the codes and other information delivered in connection with Section 3.4(b) of this Agreement.

10.8    Severability

If and to the extent that any court of competent jurisdiction holds any provisions (or any part thereof) of this Agreement to be invalid or unenforceable, such holding shall in no way affect the validity of the remainder of this Agreement.

10.9    Governing Law

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida applicable to contracts executed and to be performed in such State.

10.10    No Presumption

The parties hereto have participated jointly in the negotiation and drafting of this Agreement.    In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

10.11    Counterparts

This Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute and be the same instrument.

[SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

**ADVANCE SERVICE GROUP LLC DBA IN ADVANCE CAPITAL**, a New York limited liability company

By: _____
Name: Chris Gravagna
Title: President

Address:

Advance Service Group LLC DBA In Advance Capital
1430 Broadway Ste 402
New York, NY 10018
Attention: Chris Gravagna
E-mail: chris@inadvancecap.com

with a copy to:

Law Offices of Steven Zakharyayev, PLLC
1430 Broadway #402
New York, NY 10018
Attention: Steven Zakharyayev
E-mail: steven@empirerecover.com


**1 GLOBAL CAPITAL LLC**, a Florida limited liability company

By: _____
Name: Bradley D. Sharp
Title: Chief Restructuring Officer

Address:

1 Global Capital LLC
1250 E. Hallandale Beach Blvd. Suite 409
Hallandale Beach, FL 33009
Attention: Bradley D. Sharp
E-mail: bsharp@dsi.biz

with a copy to:

Greenberg Traurig, P.A.
333 S.E. 2nd Ave Ste 4400
Miami, FL 33131
Attention: Paul J. Keenan Jr.
E-mail: keenanp@gtlaw.com

*[Signature Page to Asset Purchase Agreement*
*between 1 Global Capital LLC and Advance Service Group LLC]*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

**ADVANCE SERVICE GROUP LLC DBA IN ADVANCE CAPITAL**, a New York limited liability company

By:_____
Name:  Chris Gravagna
Title:_____

Address:

Advance Service Group LLC DBA In Advance Capital
1430 Broadway Ste 402
New York, NY  10018
Attention: Chris Gravagna
E-mail:  chris@inadvancecap.com

with a copy to:

Law Offices of Steven Zakharyayev, PLLC
1430 Broadway #402
New York, NY 10018
Attention: Steven Zakharyayev
E-mail:  steven@empirerecover.com

**1  GLOBAL  CAPITAL  LLC**, a Florida limited liability company

By:_____
Name:  Bradley D. Sharp
Title:  Chief Restructuring Officer

Address:

1 Global Capital LLC
1250 E. Hallandale Beach Blvd. Suite 409
Hallandale Beach, FL 33009
Attention: Bradley D. Sharp
E-mail:  bsharp@dsi.biz

with a copy to:

Greenberg Traurig, P.A.
333 S.E. 2nd Ave Ste 4400
Miami, FL 33131
Attention: Paul J. Keenan Jr.
E-mail:  keenanp@gtlaw.com

*[Signature Page to Asset Purchase Agreement
between 1 Global Capital LLC and Advance Service Group LLC]*

Schedule 10.7
Purchased Assets

**Funded Deals**

There are approximately 3,239 customers with funded deals, and approximately 4,760 funded applications.  For these funded deals, the purchased information includes the following:

- Application Number
- Application Type
- Concurrent Flag
- Legal Name
- ISO Name
- Deal Type
- Payment Type
- Funded Date
- Funded Amount
- Payback Amount
- Term (months)
- Factor
- RTR Balance
- Payment Start Date
- Expected Payment
- Frequency
- Initial Payoff Date
- Account Status
- Deal Status
- Bus Address
- Bus City
- Bus State
- Bus Zip Code
- Bus Phone
- Bus Fax
- Owner Phone
- Email
- Website
- Cash Receipts (by Month)
- Last Payment Date

**Non-Funded Deals**

Among the non-funded deals, there are approximately 53,000 customers and approximately 57,000 non-funded applications.  For these non-funded deals, the purchased information includes the following:

- Application Number
- Application Date
- Application Status
- Application Sub-Status
- Legal Name
- Bus Address
- Bus City
- Bus State
- Bus Zip Code
- Bus Phone
- Bus Fax

Note: The purchased information may not include all of the items listed above for each account.