UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:                                         Chapter 11

1 GLOBAL CAPITAL LLC, *et al.*,[1]             Case No. 18-19121-RBR
                                               Jointly Administered

　　　　Debtors.
_____/

## MOTION TO CONVERT TO CHAPTER 7 AND OBJECTION TO THE ADEQUACY OF THE DISCLOSURE STATEMENT

Sarah Foster, a creditor in this case, ("***Creditor***"), pursuant to § 1112 of Title 11 of the United States Code ("***Bankruptcy Code***"), respectfully requests conversion of these cases from Chapter 11 to Chapter 7 and objects to the adequacy of the Disclosure Statement.

### Preliminary Statement

1.　　　　After a year in Chapter 11,[2] more than $3.2 million in professional fees,[3] and four motions to extend the exclusive deadline to file a plan, the Debtors and the Committee and their two teams of professionals have filed a joint Plan of Liquidation ("***Plan***") and Disclosure Statement.[4] Disappointingly, the Plan is not filed in good faith, is unconfirmable, harms creditors, and seeks to administer this high-profile bankruptcy case under a shroud of secrecy. And the Disclosure Statement will confuse and mislead creditors because it fails to adequately disclose critical aspects of the Plan.

---

[1] The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: 1 Global Capital LLC, 1250 E. Hallandale Beach Boulevard., Suite 409, Hallandale Beach, FL 33009 (9517); and 1 West Capital LLC, 1250 E. Hallandale Beach Boulevard., Suite 409, Hallandale Beach, FL 33009 (1711).
[2] On July 27, 2018 ("***Petition Date***"), the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code [ECF No. 1].
[3] *See* Debtor's May 2019 Operating Report at ECF No. 755.
[4] *See* ECF Nos. 724 & 725.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

2.      The Plan grants James S. Cassel the title "liquidating trustee," but ambiguously appears to cede control over the liquidating trust to four of the seven committee members ("**The Four**"), none of whom are qualified to oversee or manage this Bankruptcy Case or the complex litigation claims that will be filed and pursued. The Plan permits Mr. Cassel and The Four to burden the estates with two separate sets of professionals. Further, the Plan harms creditors by deceptively encouraging them unwittingly to (potentially) eviscerate all of their personal, direct tort claims they may have against any and all third-parties.

3.      A plan may only be confirmed if proposed in good faith. 11 U.S.C. § 1129(a)(3). "In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process and the purposes of the reorganization provisions."[5] As there is no business to reorganize, it is apparent that the Plan was not filed in good faith given:

- Management of the estate by unqualified persons;

- Duplicative and expensive sets of professionals;

- Elimination of basic tenets of bankruptcy policy, including transparency, integrity of the process and law, such as public fee applications and Rule 9019 motions;[6]

- Stripping away of creditors' tort claims (without disclosing that the assignments may be ineffective and that at least some of The Four will not assign their claims along with the significant implications) through the misleading carrot / stick of promising additional compensation that does not exist and instead diluting the claims of creditors who do not assign;

- Apparent self-dealing by The Four without full and complete disclosure of their conflicts, connections and self-dealing;

- Gratuitous exculpations to professionals;

---

[5] *In re Albany Partn., Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984); *see also In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan.") (notations omitted).

[6] "Good faith" per § 1129(a)(3) is absent where the plan seeks a result inconsistent with the standards under the Bankruptcy Code. *See In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994).

- Apparent inability (certainly non-disclosure) to satisfy the "best interest of creditors" test; and

- A chapter 7 panel trustee's ability to accomplish the identical results while complying with the Code's provisions for oversight and only one set of professionals.

4.      Ultimately, the Plan is the product of hubris. The Plan seeks the benefits of bankruptcy but with none of the "inconveniences" and "distractions" which protect the integrity of the process, such as fee applications, Rule 9019 motions, proper corporate governance, competent fiduciaries, adequate disclosure, and so forth.

5.      The Debtors and the Committee have squandered their year-long exclusive opportunity to submit a simple and fair plan. Rather than continue the ongoing drain of estate resources with another completely revamped version, the case should now be converted to Chapter 7[7]. The Office of the U.S. Trustee can immediately appoint an experienced, qualified chapter 7 panel trustee, unburdened by meddling, conflicted, unqualified oversight from The Four. A trustee will retain a single set of professionals, be allegiant only to the interests of creditors and administer this case in a transparent manner consistent with the Bankruptcy Code.

## Background as to the Creditor

6.      Creditor Sarah Foster is an Arizona resident, whose address is 15050 North Deerview Trail, Prescott, AZ 96305, and who invested $75,000 through a co-called Memorandum of Indebtedness.  She filed Claim No. 174 with the Bankruptcy Court (Claim No. 478 with the Claims Agent) and is an unsecured creditor with an allowed claim in the amount of $79,597.23.

7.      Since 2018, counsel for Foster and a putative investor class ("***Foster Counsel***") have invested tremendous resources asserting claims on behalf of a class of investors who are entitled to recoup their investment in 1 Global's unregistered securities. In September 2018, Foster

---

[7] *See e.g. In re Federal Roofing Co., Inc.* 205 B.R. 638 at 641-642 (Bankr. N.D. Ala. 1996) (along with cases cited).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Counsel brought class action lawsuits on behalf of a putative class of investors against Carl Ruderman, Kopelowitz Ostrow, P.A. ("***KO***"), and Dale Ledbetter in Florida, and sued several First Global sales agents in California and Arizona. Foster Counsel entered into tolling agreements with certain of the sales agents to begin settlement negotiations. Foster Counsel also commenced negotiations with Ruderman, Ledbetter, and KO to attempt a prompt resolution on behalf of the class, dismissing KO from the Florida suit in exchange for one such tolling agreement.

8.      After Ledbetter removed the Florida action to this Court in November 2018 and the Creditor's motion for remand was fully briefed, Foster Counsel brought the Debtors and the defendants together to pursue formal mediation. Foster Counsel organized a full-day February 6, 2019 mediation before respected mediator Rodney Max, inviting the Debtors, the Committee, Ruderman, Ledbetter, KO, and KO's insurance carrier. To prepare for the mediation process commenced by Foster Counsel, the Debtors expanded the role of its special counsel, Genovese Joblove & Battista, P.A. Foster Counsel issued discovery requests to the defendants to assess settlement value and worked with the Genovese firm to issue a written demand. The goal was to settle claims of creditors as well as claims of the Debtors in one forum and offer defendants global peace to maximize the recovery to creditors and maximize a limited pool of insurance. While the parties did not settle at that time, conversations were productive and Foster Counsel continued to work closely and cooperatively with the Debtors.

9.      Following the mediation, Foster Counsel continued and expanded their recovery efforts for claims held by defrauded creditors. This included researching potential claims against other targets, dozens of phone calls with mediator Rodney Max and defense counsel, and a second full day mediation for May 22, 2019. While productive, the May 22nd mediation did not result in settlement.

10.     After the second mediation, Foster Counsel furthered their efforts for the benefit of creditors. Foster Counsel organized a conference with over a dozen 1 Global sales agents to try to achieve settlements for the benefit of the class, moderated by Rodney Max. Negotiations with these sellers are ongoing. Foster Counsel filed additional lawsuits against Trae Wieniewitz, one of 1 Global's main sales agents, and the Pinnacle Plus companies, another major group of sellers. Foster Counsel stayed the Wieniewitz action to support ongoing settlement discussions and served targeted discovery along with the Pinnacle Plus complaint. Foster Counsel served notice of their intent to serve third-party subpoenas for documents on Jan Atlas, KO, Dale Ledbetter, and City National Bank, in the Pinnacle Plus case. Finally, Foster Counsel has entered into discussions with other targets (to protect confidentiality, those entities are not identified here). All told, Foster Counsel has expended significant resources seeking to maximize the distribution to creditors: whom the Disclosure Statement states the SEC has concluded to be victims of "*a four-year long unregistered securities fraud totaling more than $287 million, victimizing thousands of investors nationwide*."[8] All along Foster Counsel has sought to work in unison and cooperatively with the Debtors' general and special counsel.

11.     Before the submission of the Plan, as discussed below, Foster Counsel became aware of the Committee's desire to include a troubling aspect of the Plan, a provision in the ballot to entice creditors to assign purely personal tort claims against third parties (such as their own professionals) to a liquidating trust. Foster Counsel immediately brought to the Committee's attention decisional law providing that the assignments would be ineffective and in fact hurt creditors by potentially destroying their personal claims. The Committee counsel then led Foster Counsel to believe that such a provision would not be included in the Plan. Concerned about

---

[8] Disclosure Statement at page 35.

whether the Plan might have other ill-conceived provisions, Foster Counsel asked for a draft term sheet of the proposed plan and to meet to discuss. No term sheet was offered and no meeting granted. When the Plan and Disclosure Statement were finally filed with no advance preview, Foster Counsel was disappointed to review the terms, especially after the constant, ongoing cooperation Foster Counsel had provided for so many months. After a measured review of the Plan documents, and an in-person meeting with the Debtors' general and special counsel, Creditor has no choice other than to object to the adequacy of the Disclosure Statement and seek immediate conversion to Chapter 7.

12.     The Plan process has been mismanaged, the Plan has not been proposed in good faith and the Disclosure Statement is not just inadequate, it is deceptive. Creditor files this motion because it is in the best interests of creditors for the case to be converted immediately and for an independent trustee to be appointed to administer this case.

**Overview of the Plan and Disclosure Statement and Related Argument**

**There is Nothing to Reorganize**

13.     The Debtors' "operations" consist only of collecting receivables and prosecuting litigation claims. No new business is being, or will be, conducted. That litigation has been, or will be, filed in this Court as well as in Circuit Court. The proposed Plan does nothing to enhance the Debtors' litigation claims. And in fact, it increases administrative expenses which will be borne by creditors and creates defenses to claims where none presently exist, as explained below. All of the litigation may be professionally managed by an independent Chapter 7 panel trustee who will recognize his allegiance is not to The Four but to the creditor body, a group the SEC has determined to be the victims of the Debtors' massive securities fraud.[9]

---

[9] Multiple witnesses have invoked their 5th Amendment privilege against self-incrimination.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

## The Role of the Liquidating Trustee

14.     Establishing corporate governance is a key function of any liquidating plan. But at best, Mr. Cassel's role as "liquidating trustee" is confusing and ambiguous.

15.     While Mr. Cassel would act as the "face" of the post-confirmation trust, The Four will "***oversee** [his] acts, decisions and functions*:"[10] code words for voting creditor/victims to decipher.  During a meet and confer session, the Debtor communicated that these words mean that The Four may merely make their views known to Mr. Cassel, who is then free to ignore and disregard those views.  However, that interpretation is inconsistent with the plain language that empowers The Four to direct Mr. Cassel with Mr. Cassel to vote only if The Four are deadlocked[11] and that appears to require the Trustee to obtain the "*approval of the Oversight Committee*."[12] At a minimum, the failure to use simple language to make clear the powers of The Four evidences the inadequacy of the Disclosure Statement.

16.     In any event, overseeing or managing complex litigation claims in a fiduciary capacity for the benefit of thousands of victims of a $287 million securities fraud is not an entry-level position. The Disclosure Statement fails to identify or explain why any of The Four are qualified to manage complex fraud litigation or claims for professional negligence.[13] The Disclosure Statement describes zero experience by any of The Four serving as fiduciaries,

---

[10] Emphasis added.

[11]  Section 3.1.1 of the Liquidating Trust Agreement.

[12]  Section 3.2 of the Liquidating Trust Agreement: "*Subject to the terms of the Plan, the Confirmation Order, and this Agreement, including Section 3.1.1 of this Agreement, and in consultation with or, where expressly provided in this Agreement or the Plan, approval of the Oversight Committee, the Trustee shall have the powers to take the actions granted in this Section 3.2.*" (emphasis added). Section 3.2 then proceeds to list 19 categories of powers including the power to compromise claims.

[13] *See generally In re Scioto Valley Mortg. Co.,* 88 B.R. 168 (Bankr. S.D. Ohio 1988) (disclosure statement is primary source of information for stakeholders to make informed decisions about the plan, and one category is adequate disclosure of "[i]nformation regarding the future management of the debtor."); *see also, generally, In re GAC Storage El Monte, LLC*, 489 B.R. 747 (Bankr. N.D. Ill. 2013) (Plan unconfirmable where it failed to make adequate explanation of management of the reorganized debtor).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

managing professionals or fiduciaries, or overseeing / prosecuting / compromising complex litigation claims.  No resumes are provided.  No relevant experience is detailed.

17.     And no disclosures are made of any role or connection any of The Four had in the Debtors' fundraising efforts. There is no disclosure whether the Debtors hold Chapter 5 or other claims against any of The Four. There is no disclosure that one of The Four lives in Belgium; query whether he will fly 7,400 kilometers each way to attend meetings at the estates' expense.

18.     By contrast, a Chapter 7 trustee will be eminently qualified, disclose all connections, understand the role of a fiduciary, and be available within the United States of America -- and this District in particular -- as required. A Chapter 7 trustee will ensure these estates are professionally managed and disclose all connections.

### Duplicative and Expensive Professionals

19.     The Disclosure Statement states that The Four and Mr. Cassel may have their own overlapping set of professionals.[14] There is no reason for this duplication. The liquidating trust needs only one general counsel to supplement the existing special counsel that will handle the estate's litigation. There is no need for an additional law firm (or financial consultant). And not surprisingly, no budgets are provided for either.[15] No disclosure is provided as to why so many professionals should bill the estates (which hold almost $87 million in cash). A panel chapter 7 trustee will avoid these problems. One fiduciary means one set of professionals and less fees. This case is about compensating victims, not billing opportunities for an unknown number of professionals. A Chapter 7 trustee will understand this.

---

[14] *See* Section 6.02 of the Plan: "*the Oversight Committee may retain independent counsel*…"  See Section 6.19 of the Plan: "*The Professionals to the Creditors' Committee may be retained by… the Liquidating Trust Oversight Committee*."

[15] *See generally, In re Coastal Realty Investments, Inc*., 2013 WL 214235, *6 (Bankr. S.D. Ga. Jan. 17, 2013) (finding a disclosure statement to be inadequate where there was not support for the provided budget, let alone no budget at all).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

**No Fee Applications**

20.     The Plan makes clear that none of the two sets of professionals will ever be held accountable to victim/creditors or this Court because they need not file fee applications. The Disclosure Statement fails to explain to voting victim/creditors this deviates from existing practice in this District and why it is appropriate. The absurd justification appears to be that the Plan is modeled after the Plan in the *Woodbridge* case pending in Delaware; and in Delaware post-confirmation professionals need not file fee applications. This is a non-sequitur.

21.     Fee applications are not overrated. Transparency is necessary, especially in large bankruptcy cases such as this one where the SEC has concluded that creditors are fraud victims; as this Court has stated:

> Disclosure of fees is a fundamental concept in bankruptcy and was of paramount import to Congress when enacting the Bankruptcy Code of 1978. Integrity is at the heart of the bankruptcy system and disrepute would result from inadequate disclosure, whether resulting from negligence or absent bad faith.[16]

The Plan proponents seek to eliminate the legally-mandated accountability in this case. And if this Court confirms a Plan that dispenses with the need for post-confirmation fee applications and Rule 9019 motions, this approach in a case of this magnitude will become precedent in this District to the detriment of the integrity of the bankruptcy system, creditors and the public. While fee invoices will be shared with the SEC – which is undoubtedly a party-in-interest and should receive the applications – there is no reason for fee applications to be withheld from: (i) the Court, (ii) victim/creditors for whom the trust is supposed to benefit; (iii) and the Office of the U.S. Trustee.

---

[16] *In re Century Plaza Assoc.*, 154 B.R. 349, 352 (Bankr. S.D. Fla. 1992); *see also, generally In re Coastal Plains. Inc.*, 179 F.3d 197, 208 (5th Cir. 1999) (general discussion of the importance of disclosure in bankruptcy); *In re Ramirez*, 2006 WL 3838176, *3 (Bankr. S.D. Tex. Dec. 29, 2006) ("[T]he broad policy of the Bankruptcy Code ... favors transparency and disclosure whenever possible."); *In re eToys, Inc*., 331 B.R. 176, 187 (Bankr. D. Del. 2005) ("Disclosure goes to the heart of the integrity of the bankruptcy system.") (internal citation omitted).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

All post-confirmation fees should be subject to judicial review. The lack of transparency as to fees, the failure to identify who will be counsel, the failure to identify the roles of various counsel and financial professionals, the failure to provide any type of budget, the attempt to prevent victim/creditors from seeing the fees, and the desire to shield fees from this Court's review, together evidence that the Plan was not proposed in good faith and instead was proposed *by* The Four *for* The Four.  A Chapter 7 trustee will recognize that this case is not about The Four.  This case is about maximizing the return to thousands of victim/creditors.

### Unknown How the "Fiduciaries" will be Paid

22.    The Plan fails to make the simple disclosure how Mr. Cassel will be compensated and victim/creditors presumably will never know since he need not file fee applications. And as stated above, no budgets are provided.  By contrast, a Chapter 7 trustee's reasonable compensation is determined by the Court following the filing of public fee applications and capped by a statutory limit.

### Potential Destruction of Creditor Tort Claims

23.    The Plan offers creditors a second chance to be victimized. Creditors are encouraged to assign – without limitation as an all-or-nothing prospect – every type of personal tort claim they might hold against any party to the liquidating trust. There is no disclosure as to what these claims might consist of or whether they are even assignable under applicable law. It is unclear if any thoughtful analysis was performed. If one was, the Disclosure Statement discloses nothing about that analysis.

24.    But far more troubling, the Plan fails to address (and shockingly the Disclosure Statement and the proposed plan solicitation letter[17] both fail to disclose) District Judge Gold's

---

[17] *See* ECF No. 779.

decision in *Mukamal v. Bakes*, 383 B.R. 798, 811–14 (S.D. Fla. 2007) holding that such assignments are ineffective unless made by all creditors of the estate (and other case law ruling that such assignments, even if made by all creditors, are ineffective[18]).

25.     Here, it is impossible for every single creditor to assign his / her claim because creditors that have filed their own lawsuits -- including some of The Four -- are prohibited under the Plan from doing so. Thus, the assignment of claims may ultimately be ineffective and potentially result in a wrongdoing defendant's complete insulation from liability. If The Four were genuinely concerned with the welfare and best interests of victim/creditors, rather than their own self-interests, The Four would have disclosed the existence of Judge Gold's decision and explained in a clear, thoughtful and meaningful way the potential impact. Instead, The Four elected to leave the victim/creditors ignorant through the omission of a fact they knew to be material.

26.     In April 2019, after the Committee raised the notion of an assignment-of-claims provision in the Plan, Foster Counsel immediately brought the *Mukamal v. Bakes* decision to the attention of the Committee counsel. To his credit, Committee counsel candidly acknowledged that he was unfamiliar with the decision or the concept. On April 16, 2019, the Committee counsel communicated by telephone to Creditor's counsel that while the Committee considered District Judge Gold's decision to be a "*minority view*," the Committee was "*moving away from the assignment of claims concept because we don't want to lose claims on a procedural basis by someone following the Judge Gold decision.*" The Committee, through its counsel, recognized - at a minimum - the litigation risk and potential delay until the Eleventh Circuit rules on the issue of

---

[18] *See also Kipperman v. Onex Corp*., 411 B.R. 805, 831 n. 21 (N.D. Ga. 2009) ("Litigation trustees do not have standing to directly pursue claims on behalf of creditors and creditors may not assign their claims to a litigation trust."); *Trenwick Am.Litig.Trust v. Ernst & Young, L.L.P*., 906 A.2d 168, 189–91 (Del.Ch.2006) (stating that "even if the Litigation Trust Agreement or plan of reorganization did expressly assign the direct claims of [debtor's] creditors to the Litigation Trust, federal bankruptcy law is clear that litigation trusts do not have standing to pursue the direct claims of creditors.").

standing, to the detriment of victim/creditors. And of course, if District Judge Gold's decision is followed, then the assigned claims would be eviscerated (if not rendered time-barred while the estates litigate standing potentially to the 11th Circuit). The Disclosure Statement fails to disclose what changed during the two months from April 16th to June 17, 2019, when the Plan was filed. The Committee counsel did not contact Foster Counsel to retract his April 16th comments, nor has any reason been offered for the silence on this issue, particularly given the intense interaction between the estates and Foster Counsel in the pursuit of litigation targets common to both the estates and individual victim/creditors. And certainly no substantive analysis has been shared with Foster Counsel or the voting victim/creditor body.

27.     This issue is highlighted by attached Exhibit 1. On June 24, 2019 (a week after the Plan was filed) American Alternative Investments ("*AAI*"), one of the Debtors' major sales agents with whom Creditor entered a tolling agreement, delivered an "update of key events" for these Debtors. On Page 3, under the sub-heading "Election to Assign Claims," AAI communicates that if a creditor elects to assign its claims to the Trust, then "the trustee *will have standing* to prosecute …the Assignable Claims."  (emphasis added). This is a defendant (target) communicating to victim/creditors (plaintiffs) that the liquidating trust would in fact have standing to sue it upon assignment, without disclosing – as the Plan and Disclosure Statement did not disclose – that *Mukamal v. Bakes* and other decisional law instructs that no such standing would exist.  This mis-statement of the rights of voting victim/creditors flows from the failure to make adequate disclosures in the Disclosure Statement.  The confusion that the Debtors and the Committee created is rippling, causing greater confusion among both targets and creditors. Confusion over who owns claims and the corresponding delay in bringing them only hurts victims and helps culpable parties.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

28.    The Disclosure Statement fails to disclose whether The Four will assign their own personal claims. At least one of The Four has filed an individual litigation claim, thereby disqualifying him from making an assignment under the Plan (but this is not disclosed because no connections of The Four are disclosed). If assigning claims is in the best interests of creditors, query why all of The Four are not assigning their personal claims. Certainly, at a minimum, this non-assignment by (at least) one of The Four who will control the litigation should have been disclosed, along with the reasons.

29.    An adequate Disclosure Statement would have disclosed all of The Four's private litigation claims (*i.e.*, connections) they are pursuing or may pursue and whether it includes the estate's litigation targets. The Four should confirm their post-confirmation roles are not simply a clever way to obtain insider, non-public information to allow them to gain an unfair advantage to advance their own personal litigation claims which they strategically decided not to assign. The Disclosure Statement should disclose if The Four will share valuable, confidential, non-public Debtors' work product information they learn in their fiduciary capacities with their personal litigation counsel to advance the personal claims they will pursue. The Disclosure Statement should disclose if The Four will attend mediations by the Debtors with their common litigation targets and use that as an opportunity to negotiate separate compensation for themselves for their own personal claims: all while they "oversee" Mr. Cassel (*i.e.* tell him what to do). Such a conflict is irreconcilable and yet not disclosed. By contrast, a chapter 7 trustee will not negotiate with an estate litigation target while simultaneously negotiating his own personal claim against the very same target.

30.    It is unclear if The Four believe that the only "creditor claims" that will have value (per Judge Gold's decision) will be their own retained personal claims and whether they are

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

attempting to lure thousands of victim/creditors to make worthless assignments of their competing personal claims to get rid of the competition. As an example, if The Four and 1,000 creditors have claims against Target ABC with limited insurance or financial capacity, then if the 1,000 make worthless assignments, The Four will markedly improve their positions and be better situated to reap the entire limited recovery for themselves. And to the extent personal claims are validly assigned, The Four will compete with the Debtors in their pursuit of similar personal claims against the same targets: all while they control Mr. Cassel. In that instance, The Four would be incentivized to challenge the validity of the assignments (again to limit the competition). The Four are not just unqualified to "oversee" Mr. Cassel, The Four are not independent and undeniably not "disinterested." Certainly, the lack of adequate disclosure of any of these problems highlights the lack of good faith in the submission of the Plan.

31.    The Plan proponents confuse victim/creditors into believing they will be "compensated" for their potentially worthless assignments.[19] This is misleading because there is no money to compensate them. Rather, the Plan inflates their claims by 3%, thereby diluting the non-assigning victims. No disclosure or explanation is provided as to the seemingly random number of 3% was determined to be the fair price for the assignment or whether it was simply pulled out of a hat.

32.    And of course the notion of "3% compensation" is deceptive. Assume a creditor has a claim for $10,000 and will receive a 33% distribution. By assigning personal tort claims and increasing that claim to $10,300, the creditor will not receive $300 in additional distributions. The unsecured claim will increase by $300, which will receive a 33% distribution, or $100 and not $300. In that instance, for $100, the creditor will assign every possible conceivable personal tort

---

[19] *See* Committee's proposed solicitation letter at ECF No. 779 at page 7 of 9: "*As compensation for the assignment, the Assigning Claimant's Allowed Claim will be increased by 3%.*"

claim he/she may have against anyone related to the Debtors, such as personal claims against financial advisor(s).

33.     Further, it adds insult to injury to unsuspecting creditors – already victims of a massive fraud according to the SEC – to encourage a potentially worthless assignment of their individual tort claims. This concept is not proposed in good faith. The Disclosure Statement fails to explain the mechanism to pursue the assigned claims, or the challenges, risks, delays, potential appeals, and costs associated with litigating the attendant standing issues (including payments to two sets of estate professionals to eat away at the trusts without filing fee applications while they attempt to figure it out). Certainly, the Disclosure Statement fails to explain how the Debtors will investigate and evaluate these purely personal tort claims held by thousands of victim/creditors let alone actually prosecute them, and at what cost.

34.     And while the Plan proponents encourage victim/creditors to transfer their personal tort claims, they seek to stop them from assigning their actual claims (something they have an unfettered right to do in virtually every bankruptcy case). Recently, a purchaser of claims filed a series of assignments. The Committee objected for one reason: the Debtors did not grant permission.[20] This is chutzpah. To put this in context, the Memoranda of Indebtedness -- that the SEC has concluded violated state and federal securities laws and were used to defraud and victimize creditors -- contains a provision requiring assignments to be approved by the Debtors (the wrongdoers). The Committee seeks to selectively enforce an anti-assignment provision which was likely inserted in these fraudulent instruments to further the scheme. While the Creditor has yet to depose the Committee and the Debtors in connection with the Plan, it would appear that the reason for trying to enforce this provision in a fraudulent document is to stop victim/creditors --

---

[20] *See e.g.* ECF Nos. 762-768 (query what the Committee counsel billed the estate for this exercise).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

many of whom are elderly and lost their retirement savings[21] -- from getting any compensation for their losses unless they vote for the poorly conceived Plan in order to receive a first interim distribution (whenever that will be). This effort to pressure victim/creditors – who are just trying to move on with their lives - through enforcement of a contractual provision in a fraudulent document evidences: (i) the Plan's lack of good faith and (ii) that The Four have no interest in the financial wellbeing of creditors and are unqualified to direct Mr. Cassel. Real fiduciaries look out for the best interests of the group on whose behalf they serve, especially fraud victims.

35.    And inexplicably, the Plan continues to purport to bar victims from selling their claims. The Disclosure Statement offers no justification for this. It is unclear if The Four wish to avoid claims buyers from potentially entering the case and scrutinizing their conduct.

## Unknown Impact on Creditor Securities Claims

36.    Certain creditors, including the Creditor, have filed third-party actions based on violation of securities laws. The Disclosure Statement states at page 59 that the Memoranda of Indebtedness will be cancelled and surrendered but fails to disclose how the extinguishment of these securities will affect those securities claims. The Disclosure Statement should explain to voting creditors the impact of the Plan on those securities claims. There is no justifiable basis to attempt to impair or compromise these claims in any way.

## Plan Fails the "Best Interest of Creditors" Test

37.    After a year in bankruptcy, armed with teams of well-paid financial professionals, it is inexcusable for the Plan proponents to have failed to provide any type of meaningful Chapter 7 analysis. The Plan fails to include the substantive facts, analysis or conclusion as to whether (and

---

[21] Per the SEC, many victims used their retirement savings to invest and invested based on material misrepresentations and omissions.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

if so, why) confirmation is superior to conversion, commonly referred to as "best interest of creditors" test.[22]

38.     A Chapter 7 panel trustee will not need two sets of financial and legal professionals to supplement the litigation firms handling the estate litigation. A chapter 7 trustee will ensure professionals file public fee applications available for review by all parties in interest and subject to this Court's approval. A chapter 7 trustee will file Rule 9019 motions to approve compromises and not administer this case behind a curtain. A Chapter 7 trustee will exercise his or her own independent business judgment – subject to this Court's approval on notice to all parties in interest – and not be subject to being "oversee[n]" by The (inexperienced/conflicted) Four. Professionals will be held publicly accountable and the integrity of the bankruptcy process will be protected.[23]

**Exculpation for The Four and Professionals**

39.     The Plan provides for broad, sweeping exculpation for The Four and all professionals. Yet no description is provided of the claims that might exist, nor any reason why exculpation is appropriate. Moreover, The Four and the professionals appear to provide no consideration in return for this gift from the estate. If claims do not exist, exculpation is not necessary. And if claims do exist, they must be disclosed, those seeking exculpation would be rendered conflicted, and conversion to Chapter 7 will preserve those claims for the benefit of creditors.

---

[22] *See generally In re Cassis Bistro, Inc.*, 188 B.R. 472, 475 (Bankr. S.D. Fla. 1995) ("Section 1129(a)(7), the commonly called "best interest of creditors test," requires creditors to receive a distribution not less than they would receive if the debtor were liquidated under Chapter 7 on the effective date of the plan.").
[23] *See generally In re Wilson*, 250 B.R. 686, 689 (Bankr. E.D. Ark. 2000) ("[T]he [bankruptcy] court has an interest in protecting the integrity of the judicial process, safeguarding the interests of the client and avoiding the appearance of impropriety in the proceedings, and thereby maintaining public confidence in the legal profession.").

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

## No 9019 Motions

40.     The Plan proponents believe that Rule 9019 motions are overrated. They are wrong. The main reason for the Plan is to set up a mechanism for the estate to investigate, prosecute and resolve litigation for the benefit of stakeholders. And yet, the Plan provides that those claims may be compromised without this Court's oversight or notice to any creditors. This contradiction is unresolvable. And, if approved, this will create precedent in this District and violate the principle of transparency in public bankruptcy cases. While settlements should certainly be shared with the SEC, that is not a substitute for the rights of victim/creditors or the roles of this Court and the Office of the U.S. Trustee.

## Inadequate Disclosure of the *"Strong Litigation Claims"* to be Pursued

41.     The Disclosure Statement boasts the Debtors hold "*strong litigation claims*."[24]

42.     And yet aside from reciting certain pending litigations, the Disclosure Statement fails to make any meaningful disclosure of these claims. Nor does the Disclosure Statement identify in any way the types of claims that it encourages creditors to assign. Given that the primary purpose of administering these cases is to pursue "*strong litigation claims*," these are glaring omissions that unnecessarily create risk for targets to raise a *res judicata* defense post-confirmation.[25] Conversion to Chapter 7 eliminates the risk of such a *res judicata* defense, which only exists as a result of inadequate disclosures in the Chapter 11 Plan process. There is no reason for victim/creditors to assume the risk that claims of the Debtors or the personal claims they assign to the Debtors (if those assignments are valid) will be eviscerated because of inadequate disclosure in an unnecessary Chapter 11 process.

---

[24] *See* Disclosure Statement at page 3.
[25] *See generally In re Transit Group, Inc.*, 332 B.R. 45 (Bankr. M.D. Fla. 2005).

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

**The Committee**

43.     While committees serve important roles in Chapter 11, it is unclear what tangible contributions the Committee or its professionals have provided here: other than proposing a Plan to meet the personal needs of The Four. In September/October 2018 alone, the Committee's lawyers and financial consultants charged over $800,000.[26] Through February 28, 2019, they charged over another $800,000.[27]

44.     One shudders to imagine what The Four's professionals' fees could be going forward over the unknown number of years it will take to administer this case without being required to file fee applications and allow creditors notice and the opportunity to review fees and be heard before the Court.

45.     A chapter 7 trustee will independently analyze the value, if any, provided to the estate by the Committee's team of professionals to date.

**Basis for Relief and Relief Requested**

46.     Adequate disclosure is a hallmark of the Chapter 11 process.[28] The Bankruptcy Court has an independent obligation to determine the existence of adequate information.[29] The Plan and Disclosure Statement have failed to make adequate disclosures to parties in interest.[30]

47.     Moreover, § 1112(b)(1) provides that the Court shall convert a chapter 11 case if the movant establishes "cause." Ample grounds exist – as set forth above – to warrant conversion of this case. For the reasons stated above, the Plan is severely flawed and unconfirmable.

---

[26] *See* ECF Nos. 348, 349 and 354.
[27] *See* ECF Nos. 614-616.
[28] *Scioto*, 88 B.R. at 170.
[29] *In re Eastern Main Elec. Co-Op., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991).
[30] Where a chapter 11 plan is so deficient that it cannot be confirmed, the Court should refuse to approve a disclosure statement based on that plan. *See, e.g., In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (a court should not proceed with the time-consuming and expensive disclosure statement and plan proceedings when the plan may not be confirmable.)

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

48.     The Plan proponents should not get a do-over, at the substantial expense of creditors. The numerous problems described above are not mere disclosure issues. The Plan proponents had a year to put their best foot forward and submit a Plan in good faith, make proper disclosures, and try to advance the best interests of creditors.[31] They had the opportunity to share a draft term sheet of the Plan with creditors other than The (conflicted, self-dealing) Four. They made the conscious decision to exclude any other creditors in meaningful plan discussions. They had the opportunity to quickly and efficiently propose a simple plan and instead let this drag on for a year. The Court should immediately convert this case and appoint a qualified, independent Chapter 7 Trustee.[32]

### Certificate of Good Faith Conference

As discussed above, Foster Counsel sought to meet with the Debtors and asked for a term sheet of the proposed plan, but was rebuffed. In April 2019 Foster Counsel explained to Committee counsel the perils of an assignment of claims provision. On June 27, 2019, after the Plan and Disclosure Statement were filed, Foster Counsel met in-person with the Debtors' general and special litigation counsel to discuss the deficiencies. On July 3, 2019, Foster Counsel requested to schedule a meeting with Debtors' counsel to follow-up (in advance of the July 17, 2019 4:30 p.m. deadline to file objections to the adequacy of the Disclosure Statement). A further meet and confer occurred. Creditor is willing to continue to communicate with the Debtors in good faith.

**WHEREFORE**, the Creditor respectfully requests the entry of an order:

(i)      denying approval of the Disclosure Statement;

(ii)     converting these cases from Chapter 11 to cases under Chapter 7; and

---

[31]  *See e.g. In re Federal Roofing Co., Inc.* 205 B.R. 638 at 641-642 (Bankr. N.D. Ala. 1996) (along with cases cited).

[32]  Creditor reserves the right to supplement this Motion as appropriate after discovery of the Committee and the Debtor.

(iii)    for such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 17, 2019, the foregoing document is being served via electronic mail upon those parties listed on the attached Exhibit 2 and via transmission of Notices of Electronic Filing ("*NEF*") generated by CM/ECF on all parties and counsel registered to receive NEF in list attached as Exhibit 3.

Dated: July 17, 2019.

Respectfully submitted,

s/ Michael S. Budwick
Michael S. Budwick, Esquire
Florida Bar No. 938777
mbudwick@melandrussin.com
Solomon B. Genet, Esquire
Florida Bar No. 617911
sgenet@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Attorneys for Creditor, Sarah Foster*

-and-

s/ Adam M. Moskowitz
Adam M. Moskowitz, Esquire
Florida Bar No. 984280
adam@moskowitz-law.com
Adam A. Schwartzbaum, Esquire
Florida Bar No. 93014
adams@moskowitz-law.com
THE MOSKOWITZ LAW FIRM, PLLC
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423
Facsimile: (786) 298-5737
*Attorneys for Creditor, Sarah Foster*

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

-and-

s/ Francis J. Balint, Jr., Esq.
Francis J. Balint, Jr., Esq.
Arizona Bar No. 007669
fbalint@bffb.com
BONNETT FAIRBOURN FRIEDMAN &
      BALINT PC
2325 E Camelback Road, Suite 300
Phoenix, AZ 85016
Telephone: 602-274-1100
Facsimile: 602-274-1199
[admitted *pro hac vice*]
***Attorneys for Creditor, Sarah Foster***

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3200 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363



June 24, 2019

Dear Recipient:

This letter serves as an update of key events that have occurred in the 1 Global Capital LLC (the "Debtor") bankruptcy case (the "Bankruptcy Case"):

- **April Operating Report.** On June 4, 2019, the Debtor filed its Monthly Operating Report for the month of April, 2019. The report shows cash on hand of $85,278,002 at the end of the month. The report also shows an ending accounts receivable balance of $143,742,815 for the month, with $3,091,696 collected during the month.

- **Chapter 11 Plan of Liquidation**. On June 17, 2019, the Debtor (and its debtor affiliate 1 West Capital LLC) and the Creditors' Committee jointly filed a Joint Plan of Liquidation ("Plan") and a Disclosure Statement as well as a motion to approve the Disclosure Statement, establish voting procedures for the Plan, approve the form of ballots to be delivered to creditors to vote to accept or reject the Plan, and to set a hearing to confirm the Plan. The terms of the Plan are subject to change. As currently proposed, the Plan includes the following terms:

  - **Formation of the Liquidating Trust**. The Plan provides for the Debtors' available cash and all its other property to be transferred to a liquidating trust (the "Liquidating Trust") on the Plan's effective date (i.e., a yet to be determined period of time after court approval). The Plan also provides for certain other assets to be transferred to the Liquidating Trust, including the claims assigned by investors (see below), recoveries contributed by the Receiver appointed in the SEC lawsuit as authorized by court order, and recoveries contributed by the SEC in its pending or threatened actions that it elects and is authorized to contribute to the Liquidating Trust. The trustee of the Liquidating Trust will monetize this property (including the investigation and pursuit of any litigation claims for the benefit of the Liquidating Trust), conduct the claims-allowance process, and make distributions. The Trustee will make periodic distributions to holders of allowed and approved claims (not disputed claims), including an initial distribution about thirty (30) days after the effective date of the Plan.

  - **Classes of Claims; Treatment of Claims**. The Plan classifies holders of claims into certain classes for all purposes based on their differing character and priority under bankruptcy law. Classes 1-3 consist of taxes, secured claims and other priority claims. Investors[1] and general unsecured creditors make up Classes 4 and 5 as follows: (i) Class 4A includes Investor Principal Claims, (ii) Class 4B includes General Unsecured Claims, and (iii) Class 5 includes Investor Other Claims. The remaining Classes include intercompany claims, subordinated claims and equity interests. Class 4A and 4B are entitled to vote to accept or reject the Plan.

---

[1] "Investors" are defined in the Plan as any person or entity that entered into a Memorandum of Indebtedness with either of the Debtors.

20187506.1

**EXHIBIT 1**



After the full payment of unclassified claims (including, administrative expenses and professional fees) in cash, Classes 1-3 are estimated to be paid in cash in full. Each holder of an allowed and approved (not disputed) Class 4A and 4B claim will receive the issuance of its pro rata share of a beneficial interest in the Liquidating Trust and will be entitled to distributions from the trust. The estimated recovery for Class 4A and 4B is currently unknown.[2]  Class 5 (*i.e.*, interest on the Investor claims) <u>will not receive distributions</u>, subject to modification of the Plan in the event Class 4A and 4B claims are paid in full.

– **<u>Election to Dispute Claims and Assign Claims</u>**.  The proposed Plan includes certain features that will vary or affect the ultimate treatment of holders of Investor Principal Claims based on elections made in the ballots to be approved and delivered to Class 4A claimants.

(1) ***Election to Dispute Investor Principal Claim Amount***.  Unless a holder of a Class 4A Investor Principal Claim elects to be a Disputing Claimant (see below), each Class 4A Investor Principal Claim will be deemed allowed and approved in an amount equal to the <u>original principal amount</u>, without regard to any rollovers, of the Investor's claim <u>minus</u> the aggregate amount of all payments received from the Debtors on account of such claim.  Any amounts due to an Investor in excess of the Class 4A Investor Principal Claim, including any interest, will be classified as a Class 5 Investor Other Claim.  All distributions on account of the Class 4A Investor Principal Claim will be made based on the amount set forth in the ballot.

Holders of Class 4A Investor Principal Claims may elect to dispute the amount of the claim set in their ballot and become a "Disputing Claimant" under the Plan.  For any holder of a Class 4A Investor Principal Claim that is a Disputing Claimant, all calculations with respect to such Investor's claim will be based on the aggregate claim amount asserted by the Disputing Claimant in the Investor's Proof of Claim or, if no Proof of Claim is filed, in the Debtors' Schedules or books and records.  The Disputing Claimant's pro rata share of a beneficial interest in the Liquidating Trust and Debtors' cash shall be held in a "Disputed Claim Reserve" unless and until (i) the trustee of the Liquidating Trust and the Disputing Claimant agree to the amount of the claim or (ii) a final order is entered by the Bankruptcy Court establishing the Investor's claim amount. Holders of Class 4A Investor Principal Claims that are Disputing Claimants <u>shall not</u> receive an initial cash distribution from the Liquidating Trust and may experience significant delays in payment.

---

[2]  The Debtors and Creditors' Committee state that they will file a revised Disclosure Statement before the hearing on the Disclosure Statement setting forth estimates of creditor recoveries and other projections.



(2) **_Election to Assign Claims._**  The Plan provides that each holder of a Class 4A Investor Principal Claim may agree, by affirmatively electing on its ballot, to contribute its "Assignable Claims"[3] to the Liquidating Trust. If such an election is made (i) the claimant will receive the benefit of having its Investor Principal Claim increased by 3.0% and (ii) the trustee will have standing to prosecute and, if appropriate, settle the Assignable Claims.  A claimant may not assign such claimant's Assignable Claims if the claimant has already filed a lawsuit to prosecute any of the Assignable Claims or compromised or settled any of Assignable Claims.

- **Next Steps**.  The Disclosure Statement has not yet been approved.  A hearing on the approval of the Disclosure Statement is currently scheduled for **July 24, 2019 at 1:30 p.m. (EST).**  Objections to the Disclosure Statement are due by July 17, 2019 at 4:30 p.m. (EST).  Upon approval of the Disclosure Statement by the Bankruptcy Court, holders of claims against the Debtor who are entitled to vote on the Plan will receive a solicitation package, including the Disclosure Statement, the Plan and various documents related thereto, unless otherwise ordered by the Bankruptcy Court.

Full copies of the Plan and the Disclosure Statement may be viewed, without charge, at https://dm.epiq11.com/OGC.

Sincerely,

American Alternative Investments

**THIS UPDATE IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. VOTES ON THE PLAN MAY NOT BE SOLICITED UNLESS AND UNTIL THE PROPOSED DISCLOSURE STATEMENT IS APPROVED BY AN ORDER OF THE BANKRUPTCY COURT**

---

[3] "Assignable Claims" is defined in the Plan as "all Causes of Action that an Investor has against any Person or Entity and that are related in any way to the Debtors, the Debtors' businesses, their predecessors, their respective affiliates, or any Prepetition Parties, including but not limited to (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and entry into any Memorandum of Indebtedness; (b) all Causes of Action for unlawful dividend, fraudulent conveyance, fraudulent transfer, voidable transaction, or other avoidance claims under state or federal law; (c) all Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (d) all Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of, any of the conduct described in the Disclosure Statement, including in respect of any alleged fraud."

20187506.1

Paul J. Keenan Jr., Esq.
keenanp@gtlaw.com
John R. Dodd, Esq.
doddj@gtlaw.com
Greenberg Traurig, LLP
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
*Counsel for the Debtor*

Russell M. Blain, Esq.
rblain@srbp.com
Barbara A. Hart, Esq.
bhart@srbp.com
Stichter, Riedel, Blain & Postler, P.A.
110 East Madison St., Suite 200
Tampa, FL 33602-4700
*Counsel to the Creditors' Committee*

Robert K. Levenson, Esq.
levensonr@sec.gov
Christopher E. Martin, Esq.
martinc@sec.gov
U.S. Securities and Exchange Commission
801 Brickell Ave., Suite 1800
Miami, FL 33131
*U.S. Securities and Exchange Commission*

Damaris Rosich-Schwartz, Esq.
Damaris.D.Rosich-Schwartz@usdoj.gov
51 S.W. First Avenue, Suite 1204
Miami, FL 33130
*Office of the United States Trustee*

**EXHIBIT 2**

**Mailing Information for Case 18-19121-RBR**
**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Geoffrey S. Aaronson**    gaaronson@aspalaw.com, 5408891420@filings.docketbird.com
- **Kristopher Aungst**    kaungst@wargofrench.com,
  lcruz@wargofrench.com;cpatterson@wargofrench.com;FLService1@wargofrench.com
- **David W Baddley**    baddleyd@sec.gov
- **Paul J. Battista**    pbattista@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com;jzamora@gjb-law.com;gjbecf@ecf.courtdrive.com;vlambdin@gjb-law.com
- **Russell M. Blain**    rblain.ecf@srbp.com, rblain@srbp.com
- **Mark D. Bloom**    bloomm@gtlaw.com, MiaLitDock@gtlaw.com;miaecfbky@gtlaw.com
- **Scott N Brown**    sbrown@bastamron.com,
  hharrison@bastamron.com;zlaux@bastamron.com;jmiranda@bastamron.com;kjones@bastamron.com
- **Michael S Budwick**    mbudwick@melandrussin.com,
  ltannenbaum@melandrussin.com;mrbnefs@yahoo.com;mbudwick@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com
- **Angelo M Castaldi**    acastaldi@gjb-law.com
- **Robert P. Charbonneau**    rpc@agentislaw.com,
  nsocorro@agentislaw.com;bankruptcy@agentislaw.com;bankruptcy.ecc@ecf.courtdrive.com
- **Aaron R Cohen**    acohen60@bellsouth.net
- **Michael R Dal Lago**    mike@dallagolaw.com, kim@dallagolaw.com
- **John R. Dodd**    doddj@gtlaw.com, miaecfbky@gtlaw.com;mialitdock@gtlaw.com
- **Morgan B. Edelboim**    morgan@elrolaw.com, eservice@elrolaw.com
- **Jonathan S. Feldman**    jfeldman@pbyalaw.com, eservicemia@pbyalaw.com
- **G Steven Fender**    steven.fender@fender-law.com, lm910@aol.com
- **Daniel R Fogarty**    dfogarty.ecf@srbp.com
- **Michael Foster**    mfoster@wargofrench.com,
  lcruz@wargofrench.com;cpatterson@wargofrench.com;FLService1@wargofrench.com
- **Joseph D Frank**    jfrank@fgllp.com,
  mmatlock@fgllp.com;csmith@fgllp.com;jkleinman@fgllp.com;csucic@fgllp.com
- **Solomon B Genet**    sgenet@melandrussin.com,
  ltannenbaum@melandrussin.com;mrbnefs@yahoo.com;sgenet@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com
- **Anthony F. Giuliano**    afg@pryormandelup.com
- **Larry I Glick**    lglick@shutts.com, dsuengas@shutts.com
- **Christopher P Hahn**    litigation@mauricewutscher.com, chahn@mauricewutscher.com
- **Matthew B Hale**    mhale.ecf@srbp.com
- **Barbara A Hart**    bhart.ecf@srbp.com
- **Andrew R Herron**    aherron@homerbonner.com,
  pcabrera@homerbonner.com;jyanes@homerbonner.com
- **Alan C Hochheiser**    ahochheiser@mauricewutscher.com, 8371350420@filings.docketbird.com
- **Robert L. Jennings**    hbrj@aol.com, service.rljpa@gmail.com
- **Monique D. Jewett-Brewster**    mjb@hopkinscarley.com, eamaro@hopkinscarley.com
- **Jason Z. Jones**    jjones@joneslawpa.com
- **Brian Karpuk**    sgarabato@epiqsystems.com, rjacobs@ecf.epiqsystems.com
- **Paul J. Keenan, Jr.**    keenanp@gtlaw.com, mialitdock@gtlaw.com;miaecfbky@gtlaw.com
- **Derek E Leon**    dleon@leoncosgrove.com
- **Hector E Lora**    hlora@mwbllp.com, litigation@mwbllp.com
- **Stephen A Mendelsohn**    mendelsohns@gtlaw.com, hasenh@gtlaw.com
- **James B Miller**    bkcmiami@gmail.com

**EXHIBIT 3**

- **Anthony Narula**   anthony@axslawgroup.com
- **Ned R Nashban**   NNashban@baritzcolman.com, service@baritzcolman.com
- **Ari Newman**   newmanar@gtlaw.com, crossmann@gtlaw.com;mialitdock@gtlaw.com;miaecfbky@gtlaw.com
- **Office of the US Trustee**   USTPRegion21.MM.ECF@usdoj.gov
- **Claudia Ojeda**   ojedac@gtlaw.com
- **John E Page**   jpage@slp.law, dwoodall@slp.law;dlocascio@slp.law;mvega@slp.law;msmith@slp.law
- **Paul J Pascuzzi**   ppascuzzi@ffwplaw.com, phillip@telehilladvisors.com,lnlasley@ffwplaw.com
- **Kristopher E Pearson**   kpearson@stearnsweaver.com, rross@stearnsweaver.com;larrazola@stearnsweaver.com;Atty_arrazola@bluestylus.com;cgraver@stearnsweaver.com
- **Eric S Pendergraft**   ependergraft@slp.law, dwoodall@slp.law;dlocascio@slp.law;bshraibergecfmail@gmail.com;mvega@slp.law
- **Stephanie Peral**   perals@gtlaw.com
- **Chad P Pugatch**   cpugatch.ecf@rprslaw.com
- **Harley E. Riedel**   hriedel.ecf@srbp.com
- **Kenneth B Robinson**   krobinson.ecf@rprslaw.com
- **Damaris D Rosich-Schwartz**   Damaris.D.Rosich-Schwartz@usdoj.gov
- **Neil S. Sader**   nsader@saderlawfirm.com, sadernr42111@notify.bestcase.com
- **Joseph E Sarachek**   joe@saracheklawfirm.com
- **Adam A Schwartzbaum**   adams@moskowitz-law.com, dione@moskowitz-law.com;rejane@moskowitz-law.com
- **Susan H Sharp**   ssharp.ecf@srbp.com
- **Jeffrey R Sonn**   jsonn@sonnerez.com
- **Eva Spahn**   spahne@gtlaw.com
- **Scott A Stichter**   sstichter.ecf@srbp.com
- **Richard B. Storfer**   rstorfer@rprslaw.com
- **Joel L Tabas**   jtabas@tabassoloff.com, jcepero@tabassoloff.com;kborrego@tabassoloff.com
- **Charles M Tatelbaum**   cmt@trippscott.com, hbb@trippscott.com;cvp@trippscott.com;eservice@trippscott.com
- **Annette Urena Tucker**   Annette.Tucker@kaplanzeena.com, cheryl.mingo@kaplanzeena.com,service@kaplanzeena.com,maria.escobales@kaplanzeena.com,elizabeth.salom@kaplanzeena.com
- **Mark J Wolfson**   mwolfson@foley.com, crowell@foley.com
- **Anthony G Woodward**   tony@anthonywoodwardpa.com, litigation@anthonywoodwardpa.com